David Barnum, Augustus K. Barnum, Eliza Stan-
nard, and others *vs.* Cecilia R. Barnum, Widow
and Devisee of John K. Barnum, William B.
McLaughlin, and others.

William B. McLaughlin, and others *vs.* Cecilia R.
Barnum, and others.

*Effect of an Appeal as to Evidence taken under a Commis-
sion, pending the Appeal—Equity Practice: How and when
the Failure by a Commissioner to take testimony, to give Notice
to the Parties interested, may be availed of—Effect of an
Appeal—Art. 5, secs. 23 and 31 of the Code—An Illicit con-
nexion once existing, is Presumed to continue, until that Pre-
sumption is overcome by distinct Proof of Marriage—Proof of
Marriage by Reputation and by the Declarations and Conduct
of the Parties—Evidence as to Illegitimacy—General Repute
in a Family as Evidence of Marriage—Declarations of a Father
as Evidence that his Son was Illegitimate—Extent of the
operation of an Act of a State Legislature conferring Heritable
capacity—Testamentary Construction—Meliorations and Im-
provements—Propriety of Averaging the Estimates of Witnesses
upon a question as to Value—Character of the Estimates proper
to be included in the addition for Average—Duty of Tenant for
Life to keep down Interest on a Charge or Incumbrance upon the
Estate—Payments for which a Tenant in possession will not be
allowed in Accounting for Rent—Equity Practice: When party
in Default will be allowed to prove his Claim before the Auditor;
When Witness may be permitted to Appear in Open Court and
Correct his Previous Testimony.*

By a decree dated the 14th June, 1869, all questions in respect to the claim of
B. a party to the proceedings, were reserved for future adjudication. From
this decree an appeal was taken. Under a commission issued on the 9th of

Barnum, *et al. vs.* Barnum, *et al.*    McLaughlin, *et al. vs.* Barnum, *et al.*

June, 1869, B. or those representing him proceeded to take testimony after the passage of the decree and during the pendency of the appeal therefrom; the commission and the testimony taken thereunder were returned into Court on the 30th of June, 1869. This evidence was allowed to remain in Court unquestioned until the 18th of May, 1874, when exception was filed to its admissibility on the grounds that it was taken during the pendency of the appeal, and without notice to the parties resisting the claim of B. HELD:

1st. That the pendency of the appeal from the decree of the 14th of June, 1869, constituted no sufficient ground for the exception to the admissibility of the evidence.

2nd That the want of notice could not be availed of by the exceptants, in the manner and at the time attempted by them.

An appeal does not necessarily stay all further proceedings in the cause, in reference to rights not passed upon or affected by the decree or order appealed from, but only the execution or operation of such order or decree, when bond is given as required by the Code, Art. 5, secs. 23 and 31.

If the execution of a commission to take testimony be irregular in the omission to give notice to the parties interested, or for other cause, the proper course is not to wait until the final hearing, and then seek to have the evidence excluded, but within a reasonable time after the return, to move for the suppression of the evidence; and if upon such motion the Court be satisfied of the existence of the irregularity, it can, within its discretion order the evidence to be retaken on the same interrogatories, with liberty to the adverse party to cross-examine the witnesses.

Where an illicit connexion has once existed, it is incumbent upon those who set up subsequent marriage between the parties, to show when and where it occurred; and having undertaken to prove that a valid marriage was celebrated at a particular time and place, the parties cannot be permitted, if the evidence should be insufficient to establish such marriage, to rely upon other facts and circumstances as the ground of presumption that a marriage *may* have taken place between the parties at some other and different time and place from that testified to by the witnesses; the presumption in such case being that the connexion between the parties continued to be illicit, until that presumption is overcome by distinct proof of marriage.

Marriage may be proved in civil cases, other than actions for seduction, by reputation, declarations and conduct of the parties; but when reputation is relied on, that reputation, to raise the presumption of marriage, must be founded on general, not divided or singular opinion; and where reputation in such case is divided it amounts to no evidence at all. And so with res-

pect to the declarations of the parties; the value of such declarations as evidence will always depend upon the circumstances under which they were made.

The declarations of a mother as to the marriage of her son, are admissible after her death, to show that one who claimed and was admitted, to be his son, was illegitimate.

General repute in a family, proved by surviving members of it, is admissible upon a question of marriage.

Upon a question of legitimacy the declarations of a father that his son was illegitimate, are competent evidence.

The Act of a State Legislature declaring that A. was thereby constituted a legal *heir* of B. confers no capacity upon A. to acquire property beyond the State passing the Act.

A testator, by the second clause of his will, directed in the event that his views as expressed in the first clause should be disappointed, so that a sale of the hotel buildings and grounds therein mentioned, should take place during the life of any of his children, that the proceeds of sale should be invested in mortgage, ground rents, or the debt of the United States, or of the City of Baltimore, and that, subject to the payment of one-third of the income of the investment to his wife for her life, "the said investment shall be for the benefit of my children during their lives, and after their death shall be the property, for the shares of the decedents of their *respective* children or descendants, *per stirpes;* the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stirpes,* the shares to which, if they had lived, the deceased would have been entitled " The testator by the seventh or residuary clause of his will, gave and devised all the rest and residue of his estate, of every kind, not therein disposed of, less the provision in favor of his wife, to and among his children, and their heirs as tenants in common, share and share alike. The testator, at the date of his will and at the time of his death had five children living—three sons and two daughters. Of these children but one survived when the hotel buildings and grounds were sold under a decree in Equity. Of the four deceased, two left children, and the other two never had lawful issue or descendants. By the first clause of his will, which was declared void, the testator gave the rents of the hotel establishment, as he had directed it to be leased from time to time, to his five children by name, and their respective heirs, *per stirpes.* Upon a question as to the distribution of the proceeds of sale of the hotel buildings and grounds, it was HELD:

1st. That, as the first clause of the will was void, and a sale of the premises, and an investment of the proceeds thereof, contemplated by the second

clause, the conversion in the manner directed by the testator should be regarded as effected at his death, upon the principle that equity considers that as done which is required to be done; and as it was *of the proceeds of sale* that the estates were limited, while the property remained unsold it stood in lieu of the investment of the proceeds of sale, and the estates vested in the legatees from the death of the testator.

2nd. That the language of the second clause of the will clearly imported severance or plurality of interests, and thereby constituted the children of the testator tenants in common for life.

3rd. That two of the legatees for life having died without child or descendants to take in remainder, the shares of such legatees for life, were not disposed of by the second clause of the will, but passed under the seventh or residuary clause, and became vested, the one-third part thereof, being personalty, in the wife, and the other two-thirds in the testator's children and their heirs, as tenants in common.

Where a particular estate or interest is carved out, with a gift over to the children of the person taking that interest, such gift over will embrace not only the objects living at the death of the testator, but all such as may subsequently come into existence before the period of distribution; and in such case, the children, if any, living at the death of the testator, take an immediate vested interest in their shares, subject to the diminution of such shares, that is to their being divested *pro tanto*, as the number of objects is increased by future births, during the life of the legatee for life. And, in such case, in the event of there being no objects in existence at the death of the testator to take in remainder, such remainder falls into the residue, until objects come into existence, when they take by way of executory bequest.

When and under what circumstances a party in possession of premises will be allowed for meliorations and improvements as against the claim of the rightful owner for rents and profits; and upon what principle such an account should be taken.

When an auditor is required to ascertain the enhanced vendible value of certain buildings and grounds at the time of sale, by reason of the meliorations and improvements placed thereon by the occupier or tenant, he may as the most reliable and safe method of approximating the truth in such case with the least risk of falling into gross error, take the average of all the opinions expressed by the witnesses examined on the subject.

The estimate of no witness should be included in the addition for average, whose testimony, if it stood alone, could not be relied on by the Court, as the foundation for its decision of the question.

Barnum, *et al. vs.* Barnum, *et al.* McLaughlin, *et al. vs* Barnum, *et al.*

Tenant for life bound to keep down interest on an existing charge or incumbrance upon the estate; but not bound to redeem or take up the principal of such charge for the benefit of the estate; and if the tenant has purchased any portion of the debt constituting such charge, the presumption is that he purchased it for his own benefit, and with no view of exonerating the estate.

A tenant in possession of property yielding rent, will not be allowed in accounting for the same, either for interest paid, or the discount he received for prompt payment of the tax bills as they were presented.

While a Court of Equity will not open the auditor's accounts at the instance of a party in default, it will, where the accounts have to be remanded to the auditor for re-statement for other causes, permit such party to produce his evidence to entitle him to a credit for which he claims an allowance.

Where a witness who has been examined before the auditor, applies to be allowed to correct his testimany then given, the Court, if entirely satisfied, upon a preliminary examination of the witness, that there is a real mistake, and that there is no collusion, may permit him to appear in open Court and there to correct his previous testimony, by answering over a particular interrogatory, propounded by the direction of the Court.

APPEALS from the Circuit Court of Baltimore City.

David Barnum died in the City of Baltimore on the 10th of May, 1844, leaving the following last will and testament, together with a codicil, which were duly admitted to probate:

I, David Barnum, of the City of Baltimore, do make and ordain this my last will and testament. I desire and dispose as to all my estate, as follows:

First. Desiring that my " City Hotel," in Baltimore, should be permanently conducted after my death, and believing that the property thus employed will prove a sure and better resource for my family, I do devise to my wife, Ann Kirby Barnum, and my son, Ephraim Kirby Barnum, and the survivor and the survivor's heirs, all the buildings of said City Hotel, and all the grounds thereof, and all the furniture, and all other chattels of said Hotel now or hereafter attached to it or used for it, upon the trusts following, that it to say:

In trust, that my said trustees shall, upon my death, permit Zenus Barnum and Andrew McLaughlin, or one of them, if both shall not agree, to be tenants, to use, occupy and enjoy as tenants and upon condition of conducting the said City Hotel buildings, grounds, furniture and chattels, said tenants first agreeing with said trustees to pay in equal quarterly payments to said trustees, the yearly rent of ten thousand dollars, and as part and on account of said rent, to pay as the same shall fall due the interest on the City Hotel stock, and also my debts, so far forth as the rent aforesaid as it shall accrue, shall suffice (said City Hotel stock not being included in this designation of my debts,) it being further understood that said renting to said Zenus and Andrew shall be for the term of three years, and shall not include any of the offices or apartments of the basement story of the City Hotel buildings, save only what is now used for the lower bar and lunch room of the hotel, and the apartments used for the culinary and other purposes of the hotel business; and I direct that in said agreement of renting, and in all others relating to the hotel part of said buildings, furniture and chattels, tenants shall be the bound to keep and finally deliver up in good condition as delivered to them, the said furniture and chattels, and to replace all articles thereof that shall be lost or destroyed or rendered by wear or accident useless, the risk of fire alone excepted, against which I direct that my trustees shall keep said furniture and chattels insured in such amount as they may deem prudent, taking care also to keep insured against fire, in an amount they may judge proper, the said City Hotel buildings.  And after deduction for interest and my debts aforesaid, (wherewith I principally charge said rents as they shall arise in exoneration of all my estate real or personal beside,) I direct that my trustees shall apply the rents aforesaid of said hotel part of said buildings, as follows, to wit: Three hundred

dollars thereof shall in the first instance be paid as yearly allowance, but in quarterly equal instalments, to my beloved wife in consideration of her ownership and of the use of the said hotel of a piece of ground constituting a part of the premises of said hotel, and it being understood that if there shall be a default for thirty days in any one of said payments to my wife she may take possession of said piece of ground and use or sell the same to every effect, as if regarding it no provision had in this will been made, and after said payment of three hundred dollars, the rents aforesaid shall be distributed as follows, to wit: One-third while she lives shall be paid to my said wife, and the other two-thirds in equal shares to and among my children and their respective heirs "*per stirpes*," Eliza Stannard, Frances McLaughlin, Ephraim Kirby Barnum, Richard Barnum and Augustus Barnum, my said children, and their respective heirs in like manner being entitled at my wife's death to her said one-third of said rents. And on the ending by any means, of the tenancy of said Zenus and Andrew, or of either, or if a renting as aforesaid to them or either, shall not take place, my trustees, their heirs or successors in the trust shall from time to time, during the period hereinafter mentioned, lease for terms of years, not in any case of a term exceeding ten years, the said hotel part of said buildings and ground, furniture and chattels on the terms and conditions hereinbefore mentioned, and for a yearly rent such as they, my executors, or the administrators with the will annexed shall approve, to any person or persons who they shall be entirely satisfied will well conduct said establishment as a hotel, it being hereby provided that said rents under all leasing shall be primarily as aforesaid, chargeable with said City Hotel stock interest, and in a manner as aforesaid with my debts, and the period which my trustees and their heirs and successors shall have power and are required to lease as aforesaid, shall be so long as

my said children, or any of them, or any children or descendants of them, or of any of them left by them, or any of them, at the death of them, or any of them, shall live, it being understood that any lease made during the period aforesaid, shall have full effect, and continue for its stipulated term, notwithstanding the cessation of all of said lives, before the end of the term.

Second. Should my views in the above first article of this will be disappointed, so that judicially or otherwise a sale shall take place of said City Hotel buildings and grounds, during the life of any of my children, it is my will, and I direct that my trustees, or any Court of Equity, shall cause the proceeds of sale to be invested on mortgage, or in ground rents, or the debt of the United States, or of the City of Baltimore, and that subject to the payment of one-third of the income of the investment to my wife during her life, the said investment shall be for the benefit of my children during their lives, and after their death shall be the property, for the shares of the decedents, of their respective children or descendants "*per stirpes;*" the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stirpes,* the shares to which, if they had lived, the deceased would have been entitled.

Third. The offices and rooms in the basement of the said City Hotel buildings, (except those included in the contemplated leasing of the hotel part of said buildings,) for and in respect of the rents thereof, I dispose of as follows, to wit: To my daughter, Frances McLaughlin, and her heirs, I devise the rents of the office numbered 4 (four ;) to my daughter, Eliza Stannard, the rents of the office numbered 5, (five,) to have and to hold to her and her heirs; to my son, Richard Barnum and his heirs, I devise the rents of the office numbered 6, (six ;) to my grand-daughter, Frances Waterman and her heirs, I devise the rents of the office numbered 10 (ten ;) to my

grand-son, David McLaughlin and his heirs, I devise the rents of the office numbered 9, (nine;) and to my son, Augustus Barnum and his heirs, I devise the rents of the office numbered 11, (eleven;) and in case I shall sell the coal land by this will devised to Ephraim K. Barnum, I devise to the said Ephraim and his heirs, the rents of the offices numbered 7 and 8, (seven and eight,) at the north east corner of the hotel buildings now occupied as a mineral water shop by Randall & Company, and if this devise of rents to said Ephraim shall not take effect, the said rents shall be deemed part of the general residue of my estate; and I devise and direct that my trustees shall from time to time, rent out said offices and rooms, or allow the same to be done by the respective devisees aforesaid, of the rents; and it is understood, that the devises aforesaid, to said Frances McLaughlin and Eliza Stannard, shall be for their sole and separate use, free of all liabilities for any debts or liabilities of their present or any future husband, and without any power to said devisees to apply the said rents by anticipation or by any appropriation to payment or securing the payment of any debts or liabilities of such husbands; and this limitation I direct shall apply to the rents aforesaid, mentioned in the aforesaid first article of this will, and to all shares of proceeds of sales or interests in investments accruing under this will, or by any conversion of my estate, or any part thereof by any means or circumstances, to said Frances McLaughlin or Eliza Stannard—it being competent, however, for said Frances and Eliza respectively, with assent of my said trustees, or approval of a Court of Equity, to have any change made that may be deemed expedient, of any investment under this will or otherwise accruing to them from any part of my estate, and so from time to time to change the same, and whether the change be by purchase of personal property, or real estate or otherwise, as shall as aforesaid be assented to or approved as eligible.

Fourth. I devise, that as soon as conveniently may be after my death, my country seat, on the Harford turnpike road, be sold by my executors, and that subject to an investment of one-third of the nett proceeds by my executors, for the benefit of my wife for her life, the said proceeds shall belong, share and share alike, to my children and to the children and descendants of those who shall have died before me, or before a sale, such children or descendants of the decedents taking *per stirpes*—it being understood, that the shares of my daughters, Frances and Eliza, shall be invested by my executors, or as a Court of Equity shall approve, in such a manner as may be deemed most expedient. And I do hereby charge said proceeds of sales, with payment of my debts, (it being understood that said City Hotel stock is not understood here as part of my debts,) but it is declared that my trustees shall first apply the rents as aforesaid of the hotel part of my City Hotel buildings to payment of my debts, if that arrangement for extinction of my indebtedness shall not prove impracticable, or if the procurement of moneys by mortgage as hereinafter authorized shall be practicable, then that mode of paying my debts aforesaid shall be availed of before recourse shall be had for such object to the proceeds of sales of said country seat. I devise to Zenus Barnum, for his life, the rents of the office, numbered 3 (three) of the basement story of the hotel buildings, this devise having been omitted from the above third article.

Fifth. All stocks of every kind which I shall hold at my death, I direct shall be sold and the proceeds thereof I bequeath to my wife.

Sixth. My coal land being a parcel of land in Luzerne county, in Pennsylvania, containing one hundred and thirty acres, or thereabouts, situate about fifty miles above Northumberland, I devise to my son, Ephraim K. Barunm and his heirs.

Seventh. All the rest and residue of my estate of every kind, not hereinbefore disposed of, I give and devise as

follows: One-third of real estate to my wife for life, and one-third of all personal estate to her absolutely, and subject to that provision for my wife, I devise and bequeath all said rest and residue to and among all my children, and their heirs as tenants in common, share and share alike, the shares of my daughters Frances and Eliza being however understood to be vested in trust in my executors, or my administrators with this will annexed, for their respective, separate and exclusive use, and under the limitations and restrictions mentioned as to the interests of them under the will in the third article of this will.

Eighth. If my executors or the administrators aforesaid, should deem it expedient, I hereby authorize them to convey on mortgage my City Hotel buildings and my hotel furniture and chattels aforesaid, on such terms as they may deem expedient, to obtain money for paying my debts aforesaid mentioned in the first and fourth articles of this will, and to set apart or apply for reducing the principal of such mortgage indebtedness, as well as paying the mortgage interest, such portion of the rents of the hotel part of the said buildings as they may deem expedient, either by way of actual payment to the mortgage, or of a sinking fund to accumulate for the eventual extinction of the mortgage principal.

Ninth. Any administrators with this will annexed, of my estate, shall have all powers by this will conferred on my executors.

Tenth. In case of the death of both of my trustees, the surviving executor of this will, whether acting or having accepted as executor or otherwise, and after his death, the administrators with the will annexed, shall be trustee or trustees in place of my trustees hereinbefore named.

Eleventh. I do hereby appoint my dear wife, Ann Kirby Barnum, my son, Ephraim K. Barnum, and my nephew, Zenus Barnum, executors of this will, declaring this and

none other to be my last will and testament, and hereby revoking and annulling all wills by me heretofore made.

In testimony whereof, I hereto set my hand and seal at Baltimore, this twenty-ninth day of August, in the year eighteen hundred and forty-three.

DAVID BARNUM, [Seal.]

I, David Barnum, do make and declare the following as a codicil to my above written last will and testament:

First. I do hereby devise to my beloved wife, Ann Kirby Barnum, the use and enjoyment for the personal accommodation of herself and a servant during my said wife's life, of any two adjoining rooms in the hotel, part of my hotel buildings; and all rentings of the said hotel, authorized by my will, are to be subject to the reservation under this devise in favor of my wife; but it is to be understood, that she is to have the benefit of the rooms aforesaid, and of this devise only for her own occupation thereof, actually and not with any power of transferring the same, nor while she shall dwell in any other house.

Second. It is further my will, and I direct that the board of my said wife, and her lodging, if she shall not dwell in the hotel, shall be paid by my trustees in the first instance out of the rents of the hotel part of my hotel buildings, for and during the life of my wife.

Third. In the above first devise, I conclude all necessary furniture for lodging and for a parlor, which I appropriate to her for her life accordingly, and as attached to the rooms she shall occupy.

In testimony whereof, I hereto set my hand and seal, this second day of September, in the year eighteen hundred and forty-three.

DAVID BARNUM, [Seal.]

The testator left a widow, Mrs. Ann Kirby Barnum and five children: Ephraim Kirby Barnum, Eliza Stannard,

wife of George Stannard, Frances Ann McLaughlin, wife of Andrew McLaughlin, Augustus Barnum and Richard Barnum. The widow of the deceased having declined to act as executrix under her appointment as such, letters testamentary were granted to Ephraim K. Barnum and Zenus Barnum, who as such executors conveyed the City Hotel with the furniture and other property and effects attached thereto, and included in the devises and limitations of the will, to the said Ann Kirby Barnum and Ephraim Kirby Barnum, the trustees named in said will, to be held and administered by them upon the trusts and for the purposes as therein expressed. These trustees thereupon demised the said City Hotel with its furniture and apparel to Zenus Barnum and Andrew McLaughlin, and the demise was renewed from time to time. The City Hotel property at the death of the testator was subject to an annual ground rent of $3850; and was also charged with a large sum of money, constituting what was styled the City Hotel Stock, which carried a yearly interest of $3419.

On the 26th of August, 1844, Richard Barnum, conveyed by deed to Andrew McLaughlin, his heirs, &c., all the estate, real, personal and mixed, in possession, remainder, reversion or expectancy, to which by devise or bequest or descent from the late David Barnum, father of the said Richard, he the said Richard was in anywise entitled, or might in anywise so claim, and all the benefit and interest of and in all devises and bequests, of and in the last will and testament of the said David Barnum. By deed dated the 21st of January, 1846, Ephraim Kirby Barnum conveyed to Andrew McLaughlin, the use and benefit of the office, numbered three, of the basement story of the City Hotel, formerly belonging to the said David Barnum, and the rents and profits of said office; and on the 1st of December, 1848, Caroline Barnum, widow and devisee of the said Ephraim, who died in 1847, without issue, conveyed to the said Andrew McLaughlin, all her

right, claim, interest, title or demand of and in all the estate, real, personal and mixed, in possession, remainder or reversion or expectancy, to which by devise or bequest from the said David Barnum, her late husband, the said Ephraim was entitled, and all the benefit and interest of and in all devises and bequests of and in the last will and testament of the said David, not otherwise disposed of by the said Ephraim deceased, in his lifetime, with the exception of, and excluding from the conveyance, certain coal lands situated in Luzerne County, in the State of Pennsylvania, devised to her said husband by his father, the said David. Augustus Barnum by deed dated the 18th of March, 1846, and Eliza Stannard by deed of the 19th of September, 1848, in which her husband joined, conveyed all of their right, interest and estate of whatever kind in possession, remainder or expectancy, to which they were or might be entitled, under the will of the said David, to the said McLaughlin.

In 1849, Frances Ann McLaughlin died, leaving five children: David B. McLaughlin, Augustus McLaughlin, Ann McLaughlin, William B. McLaughlin and Ephraim K. McLaughlin. Augustus Barnum died in October, 1853, leaving a widow and two children ; and there was a child born after his death. These children, David, Augustus Kirby and Augusta, on the 28th August, 1854, in the Circuit Court of the United States, for the Maryland District, by their mother and next friend, filed their bill against Ann Kirby Barnum and Andrew McLaughlin. The bill charged that Augustus Barnum, the father of the complainants, departed this life in Selma, Alabama, on the 20th of October, 1853 ; and among other things, after referring to, and setting out a part of the first clause of the will of their grandfather, David Barnum, deceased, alleged that since the death of Ephraim Kirby Barnum, the said Ann Kirby Barnum had been, and was at the time of filing the bill, the sole trustee under the will of

her deceased husband, David Barnum, and was acting as such, and that on the 15th of November, 1852, she leased to Zenus Barnum for the term of three years from the 1st of June, 1853, the said City Hotel buildings, furniture, &c., for the yearly rent of $13,000; and that the same were then occupied and used by the said Zenus Barnum and Andrew McLaughlin. The complainants claimed to be entitled under the will of their grandfather David Barnum, to receive from the said Ann Kirby Barnum, trustee as aforesaid, one-fourth of two-thirds of the moneys arising from the lease of the said City Hotel buildings, &c., to begin and to be paid from the 20th of October, 1853, the day of the death of their father, the same being the share to which he was entitled from the lease of the said City Hotel buildings, &c., during his life only, and upon his death belonged to the complainants in accordance with the will of the said David Barnum; the complainants further claimed that they were entitled to receive from the said Ann Kirby Barnum, trustee as aforesaid, one-fourth of one-fourth of the moneys arising from the lease of the said City Hotel, to be paid from the said 20th of October, 1853, being the share of their uncle, Ephraim Kirby Barnum, who died without issue. The bill also charged that the complainants had demanded of the said Ann Kirby Barnum their share and portion of the moneys due and coming to them under the trust in their grandfather's will, and that she refused to pay the same, alleging that they had been claimed and received by Andrew McLaughlin, as his own absolute right and property, in virtue of the deed to him of the 18th March, 1846, from their father. The defendants answered, and on the 14th of May, 1862, the bill was entered abated.

In December, 1851, Andrew McLaughlin, acquired by purchase of David B. McLaughlin all of the right, title and interest in the estate, real, personal and mixed, of which David Barnum died seized and possessed, and to

which he the said David B. McLaughlin was entitled by bequest or devise from the said David Barnum, or as one of the children or legal representatives of his late mother, Frances Ann McLaughlin, or in any other manner or way whatsoever. In January, 1854, he acquired in like manner, the like interest of William B. McLaughlin, and in January, 1855, the like interest of Augustus McLaughlin.

During the years 1856, 1857 and 1858 permanent valuable improvements were made by Andrew McLaughlin upon the City Hotel.

On the 8th of March, 1861, the bill in this cause was filed by the next friend of David and Augustus Kirby Barnum, infants under age, and the sole surviving children of Augustus Barnum, deceased. The bill prayed for a sale of the lot and buildings constituting Barnum's City Hotel, together with all the furniture and apparel thereof, for the purpose of distribution amongst the devisees of the deceased David Barnum, and for an account of the complainants' shares of the rents and profits of said establishment accrued since the death of their father, in October, 1853. The proper parties in interest were made defendants by this bill, and an amended bill subsequently filed.

On the 25th of November, 1862, the Circuit Court passed a decree dismissing the bill; from this decree the complainants appealed. On the appeal it was adjudged that the first clause of the will of David Barnum being void, and his purposes therein declared having been disappointed, the second clause became operative and the complainants were entitled to relief. This Court, thereupon, on the 21st December, 1866, reversed the decree of the Circuit Court and remanded the cause for further proceedings. (*Vide* 26 *Md.*, 119.) After the cause had been remanded to the Circuit Court, the complainants, on the 7th of March, 1867, filed their bill of revivor and supplement, chiefly for the purpose of following the profits

realized by the principal defendants by the use of the original premises, into additions made to them. The bill, among other things, charged that after entering the aforesaid appeal, Andrew McLaughlin departed this life, leaving the defendants, David B. McLaughlin, William B. McLaughlin, Augustus McLaughlin, Ephraim K. McLaughlin, and also Ann, the then wife of Zenus Barnum, his heirs at law ; that the said Andrew left a last will and testament, whereof he appointed the said Zenus sole executor, and trustee for certain purposes therein expressed ; that letters testamentary thereon were granted to the said Zenus; that said Zenus departed this life about the 5th of April, 1864, leaving the said Ann Barnum surviving him, and leaving also a last will and testament, whereof he appointed Francis W. Bennett and Samuel H. Tagart, of the City of Baltimore, executors, and trustees for certain purposes therein expressed ; that letters testamentary thereon were granted to the said executors ; the bill also charged that Richard Barnum, son of the testator, David Barnum, had departed this life without leaving lawful issue, but that a certain John Barnum claimed to be entitled to the interest of the said Richard, but of the nature and extent of said claim the complainants had no knowledge ; the bill further charged the marriage of the said Ann Barnum, widow of the said Zenus, with a certain David C. Gordon ; and that a certain Maria Louisa McLaughlin, wife of the said David B. McLaughlin, claimed to be entitled to all the interest of the said David in said premises, in virtue of a paper writing under his hand and seal. The proper persons were made parties defendant who with the exception of Frank Barnum, son of Zenus Barnum, deceased, and George Stannard and Eliza, his wife, appeared and answered. John Barnum, by the name of John R. Barnum, appeared, and by his answer denied that Richard Barnum died without leaving lawful issue, and claimed to be the only child and lawful issue of

the said Richard, who left a will dated the 14th of October, 1866, and a codicil dated the 26th of October, 1866, by virtue of which the respondent became the sole heir and legal representative of the said Richard Barnum. The respondent also denied that the complainants and defendants were entitled to any part of his portion of the estate derived from his grandfather, the said David Barnum, but, on the contrary, claimed that he was entitled to one-fourth of said estate, and of the rents and profits of the same, and such other estate as he was entitled to by law. In the progress of the cause Frances Waterman, wife of Jedediah Waterman, departed this life, and their children were made parties and answered. On the 4th of December, 1868, the complainants filed their petition, the complainant, David Barnum, having attained his full age of twenty-one years, in which they modified their claim, made by their bill of revivor and supplement, and limited their prayer for relief to a sale of the site of the original City Hotel, as it existed at the time of the death of David Barnum, deceased, with the buildings thereon erected, and an account of the incomes and profits of the said original, realized, or which might have been realized since the death of Augustus Barnum, their father, by the several occupants of the said premises since such period, to be taken with annual rests and interest compounded thereon, according to the course of the Court. A commission which had been issued and returned was remanded, and a great deal of testimony was taken and returned, and the cause having been brought to a hearing, the Circuit Court, on the 14th of June, 1869, passed a decree directing :

1st. A sale " of the grounds which formed the site of the City Hotel as it existed at the death of the testator, David Barnum, with all the buildings and improvements thereon as now existing, including as well the hotel part thereof, as the rooms or apartments described in the first and fourth clauses of the will of the said David, but excluding

therefrom the lot described in the first clause of the said will as Mrs. Ann Barnum's lot, with the buildings thereon."

2nd. That the property so decreed to be sold should be sold "subject to the ground rents, and to the operation of the deeds of trust from David Barnum, &c., to George Brown and D. Winchester, bearing dates respectively, 27th September, 1825, and 11th May, 1826."

3d. That the cause be referred to Daniel M. Thomas, Esq., as special auditor, to take "an account of the rents and profits of the said City Hotel buildings and grounds so adjudged to be sold, from the time of the accrual of the title of the complainants to the said premises, that is to say from the 31st of October, 1853; the said account to be taken on the basis of a reasonable rent for the said premises, as they were left by David Barnum at his death, without the meliorations and improvements made by Andrew McLaughlin after the death of the said David, and before the filing of the original bill in this cause."

4th. And an account "of the present value of all meliorations and improvements so made by Andrew McLaughlin, the same to be estimated according to the increased vendible value of said premises at this time, by reason thereof."

5th. "Also to ascertain and report the annual amount of necessary and proper repairs incurred by the occupiers of said property in each and every year since the said 31st of October, 1853."

6th. And "in the event that the share of the complainants in the said rents and profits should be less than their proportion of the present value of the improvements and meliorations of the premises, to be ascertained as aforesaid, the deficiency should be a charge on the complainants' shares of the proceeds of sale to be made under this decree."

By the decree all questions relating to the alleged claim of John R. Barnum to a share and interest in the proceeds

of sale, or to rents and profits, were reserved for future adjudication. From this decree the complainants and some of the defendants appealed.

On the appeal the decree of the Circuit Court was, by a decree of the Appellate Court, dated the 8th of December, 1869, reversed and the cause remanded, in order that a new decree might be passed, modifying the decree appealed from, as, and in the manner, directed in the opinion of the Appellate Court, filed with and accompanying the said decree of the 8th of December, 1869, and that further proceedings might be had under such new decree, in accordance therewith, and according to the usual practice and course of the Court. (*Vide* 31 *Md.*, 425.) After the cause was remanded, as directed by this Court, it became necessary, in consequence of the death of John R. Barnum, to revive the suit against his representatives, and proceedings were had whereby E. Beatty Graff, his executor, and his widow and children, the devisees named in his will, were made parties defendants; they filed their answers, but no other proceedings were had until the 25th of May, 1870, when the executor of John R. Barnum and his widow, Cecelia R. Barnum, filed a petition stating among other things, that the Court of Appeals, in their opinion, had "decided John R. Barnum now to be entitled to his proper share, &c.," and praying the Circuit Court "before signing any decree to be passed in pursuance of the decision of the Court of Appeals, to decide upon the claims of John R. Barnum upon the pleadings and testimony then in the cause, without any reservation as to his claims, they having been argued and his testimony submitted, and in order that litigation might end in this Court as to his claims." This petition was dismissed, and the Court, (PINKNEY, J.,) on the 26th of May, 1870, passed a decree directing that the City Hotel buildings and grounds in the City of Baltimore, described in the second clause of the will of David Barnum, deceased, consisting of the grounds

which formed the site of the City Hotel as it existed at the death of said testator, with all the buildings and improvements thereon as now existing, and including as well the hotel part thereof, as the rooms or apartments described in the third and fourth clauses of the said will, but excluding therefrom the lot and buildings thereon, described in the first clause of said will as Mrs. Ann Barnum's lot, should be sold, subject, however, to the ground rents thereon created; but free and discharged from the operation of the two deeds of trust from David Barnum to George Brown and D. Winchester, &c., dated respectively 27th September, 1825, and 11th May, 1826, it being the meaning and intention of this decree that the stock debt created by said deeds of trust, as far as existing, shall be satisfied and paid out of the proceeds of sale in exoneration of the said property.

That the cause be referred to Daniel M. Thomas, Esq., as special auditor, to take an account of the rents and profits of the said City Hotel buildings and grounds so adjudged to be sold, from the accrual of the title of the complainants to said premises, down to the day of sale under this decree, if the occupation of the defendants claiming under Andrew McLaughlin should continue to that date, on the basis of a reasonable yearly occupation rent of the premises in the condition in which they were left by David Barnum, without regard to any meliorations or permanent improvements made thereon during any part of that period, said yearly rent to be estimated on the basis, so far as repairs were concerned, that the occupiers, as tenants, were bound to make repairs necessary to preserve the property in the same condition in which it was at the period of David Barnum's death. And that the said special auditor should take an account of the amount of allowance to be made for the meliorations and improvements of said property made by Andrew McLaughlin, since the death of David Barnum, and prior to the filing of the original bill in this cause; said amount to be ascertained by an estimate

of the extent to which these meliorations and improvements had enhanced the value of the property at the time of sale under the decree. Such vendible value to be fixed by the price obtained for the property at that sale.

And further, that in the event the share of the complainants in the said rents and profits should be less than their proportions of the present value of the permanent improvements of the said premises, to be ascertained as aforesaid, the said deficiency should be a charge on the shares of the complainants in the proceeds of sale of the said premises to be made under this decree.

By the decree, the bill of the complainants was dismissed in so far as it sought relief in respect to the grounds added to the City Hotel since the death of David Barnum, and the buildings thereon and the profits realized therefrom, and the furniture and other personalty used with the said City Hotel, and the profits derived from the use thereof and the lot described as Mrs. Ann Barnum's lot and the erection thereon and the profits thereof.

All questions relating to the claim of John R. Barnum whose representatives, since his death, had been made parties, to a share and interest in the proceeds of sale or to rents and profits, were by the decree reserved for further adjudication ; but it was declared in consonance with the opinion of this Court, that if the case as to the claim in his right, should not be altered from the position in which it then stood, by further proof on the subject, his representatives would be entitled to his proper share, as the son of his father Richard Barnum, and a grandson of the testator, David Barnum.

From this decree the widow and executor of John R. Barnum appealed. The record transmitted to the Court of Appeals contained testimony which had not been before the Circuit Court. Under a commission issued by agreement, on the 9th of June, 1869, this testimony was taken after the passage of the decree of the 14th of June, 1869,

and during the pendency of the appeal therefrom. The commission and the testimony taken thereunder were returned into Court on the 30th June, 1869. On the 19th October, 1870, the appeal of the widow and executor of John R. Barnum was dismissed. (*Vide* 33 *Md.*, 283.)

In pursuance of the decree of the 26th of May, 1870, the trustees therein named on the 15th of October, 1870, sold the property which they were directed to sell, for $300,000, subject to an annual ground rent of $3,850. After a mass of testimony was taken, the special auditor stated various accounts ; among them account D, together with statements numbered from 1 to 10 inclusive, and also account E, which was a modification of account D. Statement No. 1 showed the extent to which the vendible value of the property sold under the decree, was enhanced by the meliorations and improvements made thereon by Andrew McLaughlin since the death of David Barnum, and prior to the filing of the bill in this cause. The extent of this enhanced value— $74,222.22—was determined by averaging the estimates of the witnesses, the auditor declining, however, to pass upon the competency of any of the witnesses to express the opinion given. In connection with this Statement, special attention was called by the auditor to the testimony of Hugh Gelston and James Broumel ; the former having stated that the increase of value in the hotel by mere time was quite sufficient to sink the whole cost of the improvements—this was regarded by the auditor as equivalent to stating that the improvements added nothing to the vendible value of the property sold. Broumel stated that the old hotel together with the improvements, added nothing to the vendible value of said property. The exclusion of the evidence of these two witnesses, or either of them, would, as stated by the auditor, materially increase the allowance to be made for meliorations and improvements.

Statement No. 2, showed the rental value of the hotel property as left by David Barnum, including shops and

offices, the tenant making ordinary repairs, from the year 1853 to the day of sale—this value was determined by the same method adopted in Statement No. 1, by averaging the estimates of the witnesses.

Statement No. 3, showed the annual amount of the ground rents—amounting to $3850—upon the leasehold property sold, as obtained from the exhibits in the case.

Statement No. 4, showed the annual interest, amounting to $3,419, on the stock debt, for which the property sold was liable.

Statement No. 5, showed the actual amount of the taxes upon the property sold, for each year from 1853 to the day of sale. The testimony in regard to the amount of taxes paid by Mr. McLaughlin, or his representatives, showed that in some cases the payments included interest, by reason of their being paid some time after they fell due, and that in other cases a discount was allowed for prompt payment. As in Statement No. 6, the taxes for each year, with other items, were credited at the end of that year upon the rental for the year, without regard to the actual date of payment; and interest was charged upon the balance of the rental only from that time. The true item of credit in each case was the actual taxes, without regard to interest or discount.

In Statement No. 6, the amount of rent for each year, from the commencement of the complainant's title to the day of sale, as shown in Statement No. 2, was credited with the ground rent, interest on the stock debt, and taxes for that year as shown by Statements Nos. 3, 4 and 5 respectively, and interest was charged upon the balance to the day of sale. No allowance was made in this Statement for insurance.

In Statement No. 7, the whole amount of the net rents and profits, with interest as shown by Statement No. 6, which accrued prior to the death of Mrs. Anne K. Barnum, after deducting her one-third thereof, under the

second clause of David Barnum's will, and the whole amount of the net rents and profits, with interest as shown by the same Statement, which accrued subsequent to her death, and prior to the day of sale, were credited with the whole amount of allowance for meliorations and improvements as shown by Statement No. 1, and one-fourth of the balance, amounting to $25,873.72, was the amount to which the complainants were entitled under the decree, in addition to their one-fourth net proceeds of sale.

Statement No. 8, showed what amount was chargeable to John R. Barnum's share of the net proceeds of sale for meliorations and improvements, and this was ascertained by crediting the whole amount of the allowance for meliorations and improvements, as shown by Statement No. 1, with the whole net rental of the property sold, from the day of Richard Barnum's death, to the day of sale, with interest on each year's rental, to the day of sale as shown by Statement No. 6, less Mrs. Anne K. Barnum's one-third of said net rental, accrued in her life-time, with interest thereon as aforesaid, as shown by the same Statement; one-fourth of the amount thus ascertained, being the amount chargeable to said share under the decree in this cause.

Statement No. 9, was prepared for the purpose of showing the amount of said interest so paid by the trustees, in order that the sum then in the hands of the trustees for distribution, might be increased to that extent, for the benefit of the distributees, other than those claiming under Andrew McLaughlin, and the shares of those claiming under him correspondingly reduced.

Statement No. 10, showed the value of the ground sold, without any buildings upon it.

The special auditor was of the opinion that, Ephraim Kirby Barnum, a son of the testator, having died without issue, the share given to him passed under the second clause of the testator's will, as if the testator had left

but four children instead of five; consequently the net proceeds of sale were divisible into four original shares or portions; of which one passed under the devise to Augustus Barnum, another under the devise to Mrs. Eliza Stannard, another under the devise to Richard Barnum, and the fourth under the devise to Mrs. Frances Ann McLaughlin. That Augustus Barnum's share, together with its share of the rents and profits accrued since his death, less its proportion of the allowance for meliorations and improvements, belonged to the complainants equally.

That Mrs. Stannard's share (she having assigned her interest to Andrew McLaughlin,) less its proportion of the allowance for meliorations and improvements, belonged to the representatives of the said Andrew during her lifetime, and after her death, to her children or descendants.

That Richard Barnum's share, together with its share of the rents and profits accrued since his death, less its proportion of the allowance for meliorations and improvements, belonged, as the case then stood, to Mrs. Cecelia R. Barnum as devisee of John R. Barnum, deceased.

That Mrs. Frances A. McLaughlin, whose share was limited after death to her children or descendants, left five children, David B., William B., Augustus, Ephraim K. and Anne; of these, the three first named conveyed all their interests to Andrew McLaughlin; the remaining two Ephraim K. and Mrs. Anne, (calling herself Annie B.) Gordon, or their assigns were each entitled to one-fifth of their mother's share; but they were not entitled to any allowance for rents and profits, as they made no claim therefor; and from the position they occupied in the case, they were to be assumed to have received their shares as they accrued. Nor were they chargeable with any part of the allowance for meliorations and improvements, as the same were made by the said Andrew McLaughlin with full knowledge of their rights.

In account D, the amount of interest on the stock debts paid by the trustees as shown by Statement No. 9, were added to the amount in the hands of the trustees, as shown by account C, and from the whole there was deducted the additional costs, and the balance was distributed as follows:

One-fourth part, together with the rents and profits shown to be due them, by Statement No. 7, were given to the complainants equally.   One-fourth part less one-fourth of meliorations and improvements as shown by Statement No. 1, was assigned to Bennett and Tagart, the trustees appointed in the stead of Zenus Barnum, deceased, who was appointed trustee by the will of Andrew McLaughlin, to be held by them during the life-time of Mrs. Eliza Stannard, with remainder after her death to her children or descendants; and one other fourth part, less the amount with which it was chargeable for meliorations and improvements, as shown by Statement No. 8, was assigned to Mrs. Cecelia R. Barnum, as devisee of John R. Barnum. The remaining one-fourth was distributed as shown by account E, and need not for the purposes of the case be particularly stated.   In taking the account of the meliorations and improvements, the special auditor, as directed by the decree, allowed for all permanent improvements made prior to the filing of the bill in this case.

On the 15th of May, 1874, James D. Gilmour, a witness who had been previously examined before the special auditor, filed his petition, in which he alleged having had his attention called to his testimony, after the commission was closed, he had read it carefully, and he requested that the same might be corrected to conform to what he intended to say; that he misunderstood the fourth interrogatory, and had he understood it, his answer would have been in accordance with an affidavit which accompanied his petition.   The petitioner subsequently appeared

in Court with the special auditor, and having been examined orally by the Court, in the presence of the counsel of the parties to the cause, and the Court being satisfied that the petitioner had answered the fourth interrogatory under a mistake as to its meaning, directed the special auditor to repeat the same to him and to take his answer. This the auditor did.

The complainants and those claiming under Eliza Stannard, on the 18th of May, 1874, excepted to the examination of the witness Gilmour, upon the application and affidavit therefor, because the same was irregular and was taken without sufficient notice, and no witness ought to be allowed to come into Court, and with a prepared statement or any other statement, contradict his former evidence, responsive to a question free from all ambiguity.

They also on the same day, excepted to the testimony taken under the commission issued on the 9th of June 1869, because the same was taken after the decree of the 14th of June, 1869, and during the pendency of the appeal therefrom; and because the same was taken without any notice.

On the 3rd of April, 1874, the complainants filed exceptions, numbered from one to twelve inclusive, and a further exception not numbered, to the special auditor's report and accounts. By a paper filed on the 9th of May, 1874, the defendants claiming under Eliza Stannard, joined in these exceptions.

William B. McLaughlin and others, the representatives of Andrew McLaughlin, filed six exceptions to the report, statements and accounts of the auditor.

Eliza Stannard and her husband George Stannard, and their children and descendants, filed separate exceptions.

And on the 26th of May, 1874, the complainants and the defendants claiming under Eliza Stannard, filed additional exceptions to the report of the auditor, and the several statements and accounts accompanying the same.

Barnum, *et al. vs.* Barnum, *et al.*   McLaughlin, *et al. vs.* Barnum, *et al.*

To avoid making the statement of the case tediously long, the exceptions taken as above, have not been set out at length. The questions raised by the exceptions, in so far as they are determined by this Court, are sufficiently stated in its opinion. The exceptions taken in behalf of the representatives of John R. Barnum to the auditor's report and accounts, as also to evidence in the cause, are omitted as unimportant, this Court having decided that he was illegitimate and consequently entitled to no part of the estate of the deceased David Barnum. The evidence bearing upon this portion of the case sufficiently appears in the opinion of this Court

The Circuit Court disallowed and overruled the exceptions of the complainants filed on the 3rd of April, 1874, in which the defendants claiming under Eliza Stannard, joined; as also the exceptions of the same parties filed on the 26th of May, 1874. The Court also disallowed and overruled the first and sixth exceptions of the representatives of Andrew McLaughlin; allowed their second exception, disallowed their third, except so far as Broumel's evidence was concerned, which should have been excluded as too vague and inconclusive to be relied on; disallowed their fourth, but directed that the estimate of the witness Gilmour, who had corrected his evidence by permission of the Court, should be taken from the average in the new account to be stated by the special auditor; the fifth exception to the non-allowance of money paid by Andrew McLaughlin for insurance upon the hotel property, was allowed so far as to permit the exceptants to prove their claim before the special auditor, subject to exception.

The Court disallowed and overruled the separate exceptions taken by Eliza Stannard and her husband and their children and descendants.

On the 26th of August, 1874, an order was passed referring the case to the special auditor to state an account in accordance with the views of the Court.

From this order the complainants and the defendants claiming under Eliza Stannard as also those representing the interests of Andrew McLaughlin, appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MILLER and ALVEY, J.

*T. A. Linthicum* and *Geo. H. Williams*, for David and Augustus K. Barnum.

[The argument upon the exceptions to the auditor's accounts is omitted.]

Upon the point as to what becomes of the shares of Ephraim Kirby Barnum and Richard Barnum, they having died without issue, the appellants contended:

First. That it has been absolutely settled by this Court in this case, that under this will, David Barnum's children, five in number, and named by him, by the will took life estates, and life estates only.

Second. That being so established, they, the five children, of themselves, had nothing to devise or to grant beyond their life estates.

Third. That this Court has so far construed the will as to the testator's intention as to say that his intent was not only to confine his children to life estates, but to keep this property in his family in perpetuity. The perpetuity part of the matter the decision has destroyed, the construction as to intent remains; and to the extent that the intention, without contravening any principles of law, can be gratified, the construction as made remains for its accomplishment. *Heasman vs. Pearse*, 7 *Chan. Appeals*, 275, (*Law Rep* )

Reading the will with or without the aid of this construction, the intention is beyond dispute, viz: after life estates are exhausted, to confine the residue to his family and descendants; and the only possible gratification of

this intent, and the only possible construction, is, that the grand-children *in esse* at his death take as a class, and *per stirpes inter sese.* The word "respective" presents no difficulty. *Watson vs. Foxon,* 2 *East,* 36 ; 2 *Jarman on Wills,* 475, (*marg.;*) *Jones vs. Price,* 11 *Simons,* 557. In these cases the word was rejected.

But even conceding there was an apparent particular intent arising from the use of this word, yet such particular intent would be contrary to the general intent, and in that case the rule of construction in Maryland is that the general intent controls and overrides the particular intent. *Chase vs. Lockerman,* 11 *G. & J.,* 185 ; *Taylor vs. Watson,* 35 *Md.,* 519.

And to effectuate this, words in conflict are freely rejected. *Robinson vs. Waddelow,* 8 *Simons,* 360.

To effect the intention of a testator manifest from the face of a will, Courts everywhere have found no difficulty in transposing and changing words, or supplying words omitted. The plain intent here is that his children should have life estates only. It is equally clear that the limitation over is in favor of his grand-children, the next in order of the primary objects of his bounty.

Failing to provide in express words for the case of a child dying without children, if it were to be held that the testator died intestate as to that share in remainder, and that the child so dying without issue had anything in life to grant beyond his life estate, or anything to devise at his death, would be to hold that the child got more than a life estate in spite of the restriction to him of a life estate only. It would be flatly to contradict the express words of the will as well as the intent ; and it would be to reward, as it were, over the others, the child for so dying childless ; and also to cut down the estate of the others, and so punish them for having children, who as grand-children to this testator, were the primary objects in order of his bounty.

*Clark vs. Tennison*, 33 *Md.*, 93 ; *Taylor vs. Watson*, 35 *Md.*, 519.

But the testator has given us his own understanding or interpretation of the words "the said *investment* shall be for the benefit of my children during their lives, and after their death shall be the property for the shares of the decedents of their respective children or descendants *per stirpes.*" He evidently supposed that these words would give the *investment* to such only of his children as should be living at the time of the making of the *investment* after the sale, and their children and descendants only. And therefore, in order to provide that all of his grand-children should share in the investment, and to guard against the exclusion of any of his grand-children whose parents might die before the investment made, he declares that "the children or descendants of such of my children as shall have died before the *investment*, taking as their absolute property and *per stirpes* the shares to which, if they had lived, the deceased would have been entitled," and by these words, as an exception, affirming his intent as before expressed, that no body should take but grand-children, and having sufficiently declared such intent, and also having, to exclude the only conclusion then in his mind, sufficiently provided that the grand-children born of a child dying before the investment was actually made, should not be deprived of their share by such death by any construction whatever; it was quite unnecessary for him to provide for the contingency of what was to become of the share of any one dying childless, as the *whole* was confined to grand-children, and grand-children *only as such*, and he had in his intent no other person whatsoever.

He was dealing with the investment as a whole, and intended the investment to go to his grand-children; and now to drop one-fifth from the investment and say that only four-fifths are to go to the grand-children, is to enlarge the express life estate only of his children to an

estate in fee or absolute, and thereby disappoint this manifest intention of the testator.

*Edward Otis Hinkley*, for Eliza Stannard and others.

The children of the testator took life estates only, and where any child left no issue living at his decease, the share of such child went to the remaining children and their descendants, in the same manner as the original shares, the whole estate, both life estates and remainders being vested at the death of the testator.

The language of the second clause is : "the proceeds of sale to be invested * * * * the said investment shall be for the benefit of my children during their lives, and after their deaths shall be the property for the shares of the decedents of their respective children and their descendants *per stirpes;* the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stirpes* the shares to which, if they had lived, the deceased would have been entitled."

The question here raised was touched upon in 26 *Md.*, 178, which case gives a general view of the intention of the testator. See *Chamberlain vs. Owings*, 30 *Md.*, 456.

In construing the will, the whole of it, even the void part, must be looked at, for the purpose of arriving at the *general intent*. *Woollen vs. Frick and Golder*, 38 *Md.*, 443–4 ; *Taylor vs. Watson*, 35 *Md.*, 524 *and* 529 ; *Chamberlain vs. Owings*, 30 *Md.*, 454 ; *Smither's Adm. of Jackson vs. Hooper and Wife*, 23 *Md.*, 285.

The *particular* intent, if not fully or clearly expressed, is nevertheless always subject to the *general* intent. *Saylor vs. Plaine*, 31 *Md.*, 163 *and* 4 ; *Thompson vs. Young*, 25 *Md.*, 459 *and* 460 ; *Taylor vs. Watson*, 35 *Md.*, 524.

The construction by *implication* of intent, when not fully *expressed* is constantly in use, and may be illustrated by many cases—as well upon wills as deeds of trust, or family settlements.

The particular language of this gift seems to force the mind inevitably to the conclusion that there was no intention of *intestacy* as to any quantum of the estate, whether in possession or in remainder; and if the Court can see that there is no intention of intestacy, then it will find the intention in the words, and construe them; and herein we find the gift to be "for the benefit of my children during their lives"—to give them more than life estates is plainly not the intent; and no *implication* can be allowed against those *express* words.

The investment is of the *whole* estate, and it, when made, is for the benefit of the testator's children for life only, as here named, and to their children and descendants if any, evidently there is no intention to leave a gap either as to numerical parts, or as to the successive estates, such as for lives or in remainder; the *whole estate* is intended to be given by this clause, so if any portion remains by failure of issue of a child, it goes by the terms of the gift as the whole is given; for it cannot be said that a piece was intended to be left to intestacy in that event.   See *Clark vs. Tennison*, 33 *Md.*, 85; *In re Ridge's Trusts*, 7 *Chan. Appeals*, 655.

It is by no means unusual to construe by implication in the absence of express language, where the presumed intention would lead to it; thus to charge debts or legacies upon the realty, to imply powers, trusts and the like.   *Budd vs. Williams*, 26 *Md.*, 273; *Tayloe vs. Mosher*, 29 *Md.*, 451; *Lett vs. Randall*, 10 *Simons*, 112.

In *Burke & Fattle vs. Chamberlain's Lessee*, 22 *Md.*, 310, it is said the testator "did not design to die intestate of any interest in possession or reversion, which he might be entitled to."   Here the gift to unborn children does not vest—there is therefore no devise to them.   It is not a contingent remainder.   The estate never went out of the testator to them; but vested only in the others named. It is not the case of a lapsed devise which goes under our

Code to the heirs of a devisee living at time of making the will and dying after—for it has been held that this statute does not apply to one not living at the date of the will. Neither is it a case of implication of cross-remainders, but a plain vesting of the whole estate of the testator, in such manner that, though liable to let in after-born grandchildren—the remainders in the estate of those who had no children, which remainders had vested, were never disturbed; but upon the death of a childless child, that remainder of the testator's estate remained as it was vested. See *Billingsley vs. Tongue*, 9 *Md.*, 569; *Young vs. Robinson, et al.*, 11 *G. & J.*, 329; *Jarman on Wills*, 295, 317, *ch.* 11; *Roper on Legacies*, 333, 487, &c., *ch.* 8, *sec.* 4; *Hawkins on Wills*, (*Am. Ed.*,) 71, 72, 75, 80, 113, 200, 223, 231, 232, 237; *Humphrey vs. Tayleur, Ambler*, 136; *O'Hara on the Construction of Wills*, 288, 296; *Lee vs. Pain*, 4 *Hare*, 251; *Cost vs. Winder*, 1 *Collyer*, 320; *Shaw vs. McMahon*, 4 *Drury & W.*, 438; *Du Bois vs. Ray*, 33 *How. Prac.*, 293; *Milbank vs. Crane*, 25 *How. Prac.*, 193; *McPherson, et al. vs. Snowden, et al.*, 19 *Md.*, 229; *Warner's Appeal*, 39 *Conn.*, 253; *Bolles vs. Smith*, 39 *Conn.*, 218; *Bailey vs. Bailey*, 25 *Mich.*, 185; *Gross' Estate*, 10 *Penn.*, 361.

*David Fowler, I. Nevett Steele* and *Reverdy Johnson,* for William B. McLaughlin and others, representatives of Andrew McLaughlin, deceased.

What disposition is to be made of the proceeds of the share of the hotel property, which belonged to Ephraim Kirby Barnum during his life?

Under the decision of this Court, the first clause of David Barnum's will was void *ab initio*, and the second clause took effect in its stead immediately on the death of the testator. *Barnum's Will*, 26 *Md.*, 177–8; 31 *Md.*, 457.

This Court held that equity treats as done that which ought to be done, and that by the failure of the first

clause, parties having become entitled to the proceeds of sale, had a right to have a sale ordered by a Court of Equity ; and it also held that by the second clause, disposing of the proceeds of sale, "*life estates are expressly given to all the children, with remainders to the grandchildren, or descendants, per stirpes.*"

This provision in reference to the proceeds, was, by construction, applied to the property itself, and the children have been treated as having a life estate in the property with remainder to the grand-children or descendants ; and upon this view, rents and profits have been allowed to the complainants to as remote a period as 1853, and allowance made to McLaughlin for permanent improvements.

It seems to be clear that under the decisions of this Court, the interest of E. K. Barnum, in the hotel property, was a life estate only in one undivided fifth part thereof. This he held and enjoyed until 1847, when he died without leaving children or descendants. To whom upon his death, did the share of the property so held by him, pass and belong ? The second clause of the will provides that the investment of proceeds "shall be for the benefit of my children during their lives, and after their death, shall be the property for the shares of the decedents, of their *respective* children or descendants, *per stirpes;*" the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stirpes*, the shares to which, if they had lived, the deceased would have been entitled." Here we have the express provision that if any of the children die the shares of the decedents shall go to their *respective* children or descendants. This is all. There are no cross-remainders, no alternate provisions to take effect if any child should die without descendants.

It is clear that by the second clause no provision is made disposing of the remainder, in the case of a child who has no descendants ; and it is equally clear that by the seventh

or residuary clause of the will, all the rest and residue of the testator's estate of every kind, not therein before disposed of, was given, subject to a provision for his wife, to and among all his children or their heirs, as tenants in common, share and share alike. The remainder, therefore, after the life estate of E. K. Barnum in his one-fifth, belonged to all the children of David Barnum, under the seventh or residuary clause of his will, and passed by their conveyances, exhibited in the cause, to Andrew McLaughlin.

Nearly all the hotel property was leasehold. In case of a void devise of real estate, the land descends to the heirs at law, and does not pass to the residuary devisee ; while in the case of a void bequest of personal property, the residuary legatee is entitled to it. *Deford vs. Deford,* 36 *Md.,* 179.

Therefore, even if this were the case of a void disposition of property by will, so much of it as was personal property would pass under the residuary clause. But here we have a case, not of a void disposition of property, but of an interest in property not disposed of at all by the second clause, and which, whether real or personal, is, therefore, expressly covered by a residuary clause which gives " all estate of every kind *not herein before disposed of."* 1 *Jarman on Wills,* 591; *(marg.)*

The whole interest therefore, in remainder in E. K. Barnum's share, both fee simple and leasehold, belonged to the children of David Barnum, under the residuary clause of the will.

The first clause of this will having been pronounced void, and the second clause having been decided not to be *in terrorum* merely, but to be an operative clause, which took effect instead of the void one, the question is, what and how did the children and their descendants take under the second clause?

The testator had five children living at the time of his death. By the first clause the rents are given to his five

children, by name, and their respective heirs, *per stirpes*. The words " my children" in the second or alternate clause, clearly means " all my children," and the Court of Appeals have so held in 26 *Md.*, 177 ; and each child, therefore, became entitled to one-fifth of the property for life, with remainder in said fifth to his or her descendants.

The controlling intention of the testator seems to have been that the property should be divided into as many parts as he left children, and that each child and his descendants should have one part.   Is there any thing in the clause which indicates that he desired or intended that a child should have a life estate, and his (the child's) descendants an estate in fee simple or absolute estate, in anything beyond the one-fifth?   We find nothing.   On the contrary the limitation—that the proceeds or investment " *shall be the property for the shares of the decedents, of their respective children or descendants,*" and the devise of the rents in the first clause to his five children by name, and " their *respectives heirs* (*per stirpes,*") seems clearly to show that he did not intend to tie up the property for his grand-children, except to the extent of one-fifth for the descendants of each child, and that he meant the residuary clause to operate, wherever this limitation did not reach.

Cross-remainders cannot be implied, because devises by implication are rarely allowed, and only when the implication is perfectly clear.   *Bond vs. Ridgely,* 18 *Md.*, 433 ; *Fenby vs. Johnson,* 21 *Md.*, 117.

Here there is nothing upon which to found such an implication.   Nor can it be successfully contended that the words " my children," in the second clause, mean children living at the day of investment.   This clause was the actual, operative clause of the will, and went into effect immediately on the death of the testator.

The devisees, therefore, took at and from the *death of David Barnum,* and their rights then vested, and they took the same interest they would have taken, if the profits

of the property itself had been devised, instead of the interest on the investment of the proceeds of sale. *Turner vs. Withers,* 23 *Md.,* 18 ; *Tayloe vs. Mosher,* 29 *Md.,* 443.

Looking to the intention of David Barnum, as gathered from the will; to the legal and reasonable construction of the language of the second clause, and to the action of this Court under this will, the conclusion is clear, that E. K. Barnum's share did vest in him for life, and that upon his death, without descendants, the interest in his one-fifth was not disposed of by the second clause, and passed under the residuary clause, to David Barnum's children, and under their deeds, to Andrew McLaughlin.

*E. Beatty Graff* and *James A. Buchanan,* for the appellees.

The representatives of Andrew McLaughlin should only be allowed for enhanced vendible value for improvements made by him from David Barnum's death up to the filing of the original bill in 1854, instead of up to 1861, because, the original bill was filed in the U. S. Court, in 1854.

This Court has said in *Barnum vs. McLaughlin,* 31 *Md.,* 447, relative to the allowance for permanent improvements made by Andrew McLaughlin, "allowance must therefore be made for permanent improvements put upon the property by McLaughlin, prior to the filing of the original bill. Nothing however can be allowed for any improvements since that date, for even according to the doctrine of the civil law, he then received such notice of the defect of his title, and of the adverse claim, as to place him in a position of making improvements thereafter at his peril." See *Tongue vs. Nutwell,* 17 *Md.,* 212 ; *Green vs. Biddle,* 8 *Wheaton,* 70.

Which then is the original bill, the one filed in 1854 or in 1861? The original bill was filed by the complainants in the U. S. Circuit Court in Equity, 28th August, 1854,

against Andrew McLaughlin, and others.   McLaughlin on the 8th of May, 1855, filed his answer to this bill.

The bill filed in 1854, was to recover the complainants' rights.   It was filed by the same complainants; it was pending when the same complainants filed their original bill in the Circuit Court of Baltimore City for the same rights, and for partition, &c., on 8th March, 1861; the original bill of 1854, was not abated until 1862; it was pending when McLaughlin made the improvements, in 1856, '57, '58, &c., for which, the auditor has allowed his representatives $74,222.22.    Andrew McLaughlin, before and at the time he made these improvements, had notice of the complainants' claims by the bill of 1854; he knew of them and denied them, &c.; he was not at the time he made said improvements, "a *bona fide* possessor," and "ignorant that his title then was contested."    See *Green vs. Biddle*, 8 *Wheaton*, 70; *Story's Equity*, secs. 655-799, 1237; he did not, *when* he made the improvements, suppose "himself to be the absolute owner," nor did he then think "himself to be legally entitled to the whole property;" nor did he "think himself absolutely entitled;" nor did he then "believe (for want of notice) his title to be a good one;" he had notice by the bill of 1854, yet in 1856, '57 and '58, he made improvements,  See *Jones vs. Jones*, 4 *Gill*, 87; *Hagthorp vs. Hook's Adm'rs*, 1 *G. & J.*, 305.; *Tongue's Lessee vs. Nutwell*, 17 *Md.*, 212.

The representatives of McLaughlin, do not come within any of these cases as respects their claim for improvements, so as to entitle them to the allowance by the auditor, because Andrew McLaughlin had notice by the bill of 1854, of the complainants' claims.

The bill of 1854, is the first or original bill; it was notice to McLaughlin of adverse claims; the bill of 1861 was only the original bill in the Circuit Court of Baltimore City; the bill of 1854 was the first notice; the bill of 1861 only re-asserted former claims, and as it were, was

supplemental to the bill of 1854; its objects were the same as the 1854 bill; this bill of 1861 is not the original bill, or the bill which first warned McLaughlin, &c., of said claims.    This Court ought not to allow the sum of $74,222.22 to the McLaughlins; this money ought to be divided among *all* parties.

Furthermore, the auditor has distributed the trust fund *as real estate*, when he ought to have distributed it *as personal* estate; because all of the Hotel property (except 35 x 67 feet on Fayette Street,) *is leasehold*, and subject to the aggregate yearly rent of $3850, which distributees have paid.

Again, the auditor has only allowed interest on rent *yearly*, when he ought to have allowed interest quarterly or half yearly, because, rents are always so paid, and the yearly rents allowed are large as compared with other buildings rented.

The Circuit Court in its decree of the 26th of August, 1874, decided that the whole one-fifth of the hotel property or proceeds of sale, in which, under the second clause of the will, Ephraim K. Barnum was conditionally to have a life estate, (because of his having died childless,) was disposed of by the seventh clause of the testator's will, "and that the said one-fifth passed to Andrew McLaughlin," by the deed from Caroline Barnum, the widow of Ephraim K. Barnum.    The McLaughlins, appellants, claim in like manner by reason of deeds from the testator's children.

The appellees contend that this Court has already distinctly decided that no portion of said hotel or proceeds of sale, passed under the seventh clause of the testator's will. See *Barnum vs. Barnum*, 26 *Md.*, 164, where it is said: "The principal part of his estate was the City Hotel * * * * To this part of his estate, his entire will and codicil relate, with the exception of clause fourth, (save its concluding sentence,) and clauses fifth, sixth and seventh." This decision shows plainly that the decree of

the Court below, as respects the one-fifth of Ephraim K. Barnum, ought to be reversed.   All the clauses of David Barnum's will prior and subsequent to the seventh clause, show plainly that the hotel property and the proceeds of sale thereof, had been disposed of by the second clause, and independently of the seventh clause.   The seventh clause does not in any way refer to the hotel property, nor to the proceeds of sale thereof, which were to arise under the sale under the second clause of the will.   The seventh clause disposes only of "all the *rest* and *residue* of my estate, of every kind not hereinbefore disposed of."   The testator had previously disposed of said proceeds under the second clause, leaving no part to pass under the seventh clause.

[The arguments upon the question of the legitimacy of John R. Barnum, are omitted, their insertion being deemed unnecessary.   Rep.]

ALVEY, J., delivered the opinion of the Court.

This case has been in this Court on several former appeals ; the first of which, reported in 26 *Md.*, 119, presented the question of the true construction of the first and dependent clauses of David Barnum's will; the second, reported in 31 *Md.*, 425, presented questions of the rights, and proper mode of accounting as between the parties, in reference to the use and occupation of the City Hotel buildings and grounds, prior to the sale thereof, under the second clause of the testator's will; and the third, reported in 33 *Md.*, 283, had reference to the question of the legitimacy of John R. Barnum, the son of Dr. Richard Barnum, deceased, one of the children of the testator, David Barnum.

The present appeal is taken from an order of the Court below, disposing of numerous exceptions taken to the accounts and statements of the special auditor, and remanding the cause to the auditor, with directions to change

and modify the accounts, in accordance with the expressed views of the Court.

The questions raised by the exceptions, and passed upon by the order appealed from, are numerous, and many of them of more than ordinary interest and importance. And without making any prefatory statement as to the nature and character of the several questions involved, we shall proceed to consider them in the order in which they appear to be most consecutively presented, without any particular reference to the number of the exceptions.

1. The first of these questions is that in respect to the legitimacy of John R. Barnum, the son of Dr. Richard Barnum, deceased. This question has not heretofore been presented to this Court; for not having been decided by the Court below until the order from which the present appeal was taken, it could never be properly presented on any former appeal; and the appeal in 33 *Md.*, 283, on which it was attempted to have the question considered, was dismissed, because it was prematurely taken.

Before proceeding to consider the main question, there is a preliminary question, as to the admissibility of certain evidence offered in support of the claim of John R. Barnum, which must be determined.

By the decree from which the appeal, reported in 31 *Md.*, was taken, dated the 14th of June, 1869, all questions in respect to the claim of John R. Barnum to share in the proceeds of the estate were reserved for future adjudication. Under a commission that issued by agreement, on the 9th of June, 1869, John R. Barnum, or those representing him, proceeded to take testimony after the passage of the decree of the 14th of June, 1869, and during the pendency of the appeal therefrom; and which commission and the testimony taken thereunder, were returned into Court on the 30th of June, 1869. The evidence taken under this commission was allowed to remain in Court unquestioned, until the 18th of May, 1874, when exception

was filed to its admissibility, on the grounds, first, that it was taken during the pendency of the former appeal; and secondly, that it was taken without notice to the parties resisting the claim of John R. Barnum. The commissioner, in his return, certifies that he met to take the testimony "pursuant to notice," without saying to whom notice was given, and in the close of his return, he certifies that it was "at the request of the solicitors of the respective parties," that he closed and returned the commission. It appears, however, that the witnesses were examined in the presence of the counsel of John R. Barnum alone, and there was no cross-examination. The testimony thus taken is supposed to be of the most material importance to those supporting the claim of John R. Barnum, since deceased.

The pendency of the appeal from the decree of the 14th of June, 1869, certainly constituted no sufficient ground for the exception to the admissibility of the evidence. That appeal, though bond had been given, only stayed the operation or execution of the decree with reference to the rights decided by it. No rights of John R. Barnum, in support of which the evidence was taken, were decided, but, on the contrary, were expressly reserved; and those rights remained pending subjects of litigation in the Court below, notwithstanding the appeal. An appeal does not necessarily stay all further proceedings in the cause, in reference to rights not passed upon or affected by the decree or order appealed from, but only the execution or operation of such order or decree, when bond is given as required by the *Code, Art.* 5, *secs.* 23 *and* 31. Nor do we think that the other ground of exception to the evidence, that is, the want of notice, can be availed of by the exceptants, in the manner and at the time attempted by them. If the execution of the commission was irregular, as alleged by the exceptants, in the omission to give notice, or for other cause, the proper course would have

been, not to wait until the final hearing and then seek to have the evidence excluded, but within a reasonable time after the return to move for the suppression of the evidence ; and if upon such motion the Court had been satisfied of the existence of the irregularity, it could, within its discretion, have ordered the evidence to have been retaken on the same interrogatories, with liberty to the adverse party to cross-examine the witnesses. This is the proper course in such cases. *Cholmondeley vs. Clinton*, 2 *Merivale*, 81 ; *Healey vs. Jagger*, 3 *Sim.*, 494 ; *Wood vs. Mann*, 2 *Sum.*, 316 ; *Underhill vs. VanCortlandt*, 2 *John. Ch.*, 345 ; 2 *Danl. Ch. Pr.*, 1148, 1150. By adopting such course the party may obtain the benefit of the evidence, notwithstanding the irregularity in taking it in the first instance, whereas, if the question be decided on an exception to its admissibility at the hearing, he may be deprived of it altogether. Here no formal exception was taken to the evidence for nearly five years after its return, and then the exception goes to its entire exclusion at the hearing. In the meantime all the witnesses may have died, or gone to parts unknown, and to sustain an exception under such circumstances might lead to the greatest hardship and injustice. The Court below did not sustain the exception, but treated the evidence as properly in the cause, and in so doing we think it was entirely right.

Having disposed of this preliminary question, we shall now proceed to consider the main question as to the legitimacy or illegitimacy of John R. Barnum, who has died during the pendency of these proceedings, and is now represented by his widow and his executor.

The right of the deceased was put in issue by the pleadings, and a large mass of evidence has been produced both in support and refutation of the claim.

The question presented is not as to the fact whether John R. Barnum was the son of Dr. Richard Barnum ; for as to that there would seem to be no doubt whatever ; but

the question is, whether John R. Barnum was the legitimate son of his father ; and this depends upon the further question, whether Dr. Richard Barnum and Caroline Butler, the mother of John, were ever married or not?

If the claim of the deceased, John R. Barnum, rested alone upon the evidence produced under the commission executed in his behalf, the exception to which we have just determined not to be well taken, we should have no difficulty whatever in declaring it valid.   The testimony of Calvin Burrows, a colored man, to the fact that he was present at the marriage of the parties, designating time and place, together with the deed executed in 1839, the inscription on the grave-stone, and the written memorandum made by Richard Barnum, enclosing the lock of hair of Caroline Butler, in the two former of which she is described as his wife, and in the latter as Caroline Barnum, are facts, if unimpeached, that would fully justify us in declaring that a marriage had taken place.   And we should do this the more readily, as the law always presumes in favor of legitimacy, and the proof shows the existence of a continued cohabitation of the parties for several years, as man and wife ; and where such is the case, the presumption is always indulged that the cohabitation is legal rather than otherwise.   For if parties live together ostensibly as man and wife, demeaning themselves towards each other as such, and especially if they are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married.   *Redgrave vs. Redgrave*, 38 *Md.*, 97 ; *Cunningham vs. Cunningham*, 2 *Dow*, 482.   But, unfortunately, the facts to which we have referred are confronted with such an array of countervailing evidence, that to maintain the existence of the marriage is rendered utterly impossible.

It is perfectly clear, and not contended to be otherwise, that an illicit connexion between the parties commenced

and continued for some time in North Carolina, before they removed to Arkansas. It was while this illicit connexion existed that Dr. Barnum left North Carolina, taking Caroline Butler with him, she then being pregnant with child. They left North Carolina in 1837, and their illicit connexion and cohabitation continued, without intermission, after their arrival in Arkansas. This being so, it is incumbent upon those who set up subsequent marriage between the parties to show when and where it occurred. *Cunningham vs. Cunningham*, 2 *Dow*, 482; *Lapsley vs. Grierson*, 1 *Ho. L. Cas.*, 498. Here it is affirmed and attempted to be shewn, that the parties were subsequently married in 1838 or 1839, at the village of Manchester Bluff, in Clark County, Arkansas; and that the marriage celebration took place before and in the office of one Edmonson or Edminston, a Justice of the Peace. And having thus fixed upon time and place, and assumed to prove that a valid marriage was then and there celebrated, and at no other place, if the evidence should be insufficient to establish such marriage, thus assumed to be proved, the parties cannot be permitted to rely upon other facts and circumstances as the ground of presumption that a marriage *may* have taken place between the parties at some other and different time and place from that testified to by the witnesses; the presumption in such case being that the connexion between the parties continued to be illicit, until that presumption is overcome by distinct proof of marriage. *Cunningham vs. Cunningham*, 2 *Dow*, 482; *Redgrave vs. Redgrave*, 38 *Md.*, 98, 99; *Blackburn vs. Crawford*, 3 *Wall.*, 175. Marriage may, doubtless, be proved, in civil cases, other than actions for seduction, by reputation, declarations and conduct of the parties; but where reputation is relied on, that reputation, to raise the presumption of marriage, must be founded on general, not divided or singular opinion; and where reputation in such case is divided it amounts to no evidence at all. And so with respect to the declarations of the par-

ties ; the value of such declarations as evidence will always depend upon the circumstances under which they were made.  Such is the rule laid down by both Lord ELDON and Lord REDESDALE, in *Cunningham vs. Cunningham,* to which we have before referred.

The only witness produced who professes to have any personal knowledge of the actual marriage, is Calvin Burrows, who was a slave of Dr. Barnum, and a boy of thirteen or fourteen years of age, at the time the supposed marriage took place.  He says that he was present when Dr. Barnum and Caroline Butler were married, in 1838 or 1839, in Manchester Bluff, Dallas County, Arkansas ; and that Squire Edmonson performed the marriage ceremony, in his office ; that after the parties were married they returned home, and lived as man and wife, and were so treated by their neighbors who visited them.  He also proved that after this marriage, John R. Barnum, in whose right the present claim is made, was born ; and he mentions, as persons who were present at the birth of the child, Dr. Augustus Barnum, who was the brother of Dr. Richard Barnum, a Mrs. Davis and a Mrs. Grey.  Dr. Augustus Barnum is dead, Mrs. Davis has not been produced as a witness, and the only Mrs. Grey who is known to have resided in the neighborhood at the time testifies that she knows nothing of the event to which the witness, Burrows, refers.

With respect to the marriage ceremony of which Burrows speaks, it is to be observed, that he gives no details, no description of what occurred, or of the persons present except the parties themselves.  It is much to be regretted that the witness was not subjected to a cross-examination, in order that his veracity or his memory might have been thoroughly tested.  By that means we could have better seen whether there was any foundation for the story told by him.

By the law of the State of Arkansas, in force at the time this marriage is said to have taken place, among the sev-

eral civil officers authorized to solemnize the rites of marriage, are Justices of the Peace of the county where the marriage takes place ; and it is expressly made the duty of all persons authorized to solemnize marriages, within sixty days after the marriage occurs, to return a certificate thereof to the clerk and recorder of the proper county, to be by the latter duly registered ; and any Justice of the Peace or other officer, who may neglect or fail to make and return the certificate, is declared to be guilty of a misdemeanor, and liable to criminal punishment.   There is no certificate of the marriage produced, nor any evidence that one ever existed.   This is a strong circumstance in the case, as it must be presumed that a Justice, celebrating the marriage, would have performed his duty, and especially as the performance of that duty was enforced by prescribed penalties of the law.   If any such certificate was ever made, it would not only be the best evidence of the fact of marriage, but would be of easy production.

But the evidence, we think, makes it perfectly clear beyond doubt, that there was no Justice of the Peace in Manchester Bluff, or in Clark County, during the years of 1838, 1839 or 1840, by the name of Edmonson or Edminston.   There was a person by the name of Edmonson, and the only one known of that name, residing in that village during that period ; but he was a merchant, and not a Justice of the Peace.   The records of the Executive Department of the State furnish no evidence that any person of that name, or of any name of like sound, held commission as Justice af the Peace for the county of Clark, during the period mentioned.   There is a certificate produced from the Secretary of State, that a party by the name of Edminston was commissioned as Justice of the Peace for another and a remote county in the State, during that period ; and the proof is, that the only commissioned Justice for Clark County, during the years mentioned, was Thomas C. Hudson.   It has, however, been insisted, that the party named

Edminston, the Justice for Washington County, in that State, may have accidentally or casually been at Manchester Bluff, and been called upon and performed the marriage ceremony. But in this there is an entire want of probability, though it may be within the range of possibility. Such a supposition can form no ground upon which a rational conclusion can be based, in an inquiry like the present.

Hudson swears positively that Edmonson, the merchant, was not a Justice of the Peace, and that he, Hudson, was the only commissioned Justice for Clark County, during the years 1838 and 1839 ; and the statement that Edmonson was not a Justice, derives strong corroboration from the circumstances connected with the execution of the deed at Manchester Bluff, in February, 1839. Hudson did not live in the village, but some distance off, and he was requested to meet the parties in the village on the particular occasion to take their acknowledgments of the deed, which he did. This would hardly have been the case if Edmonson had been a Justice, competent to take the acknowledgments. Edmonson was one of the witnesses to the deed ; and it is not at all improbable, that if the witness Burrows was ever present at any ceremony at that place, it was the execution of this deed of the 29th of February, 1839, in the store of Edmonson, and not the marriage of his master to Caroline Butler.

In connection with the execution of this deed, in 1839, there is a significant fact. Hudson, the Justice taking the acknowledgments, states, that he did not know at the time that the woman introduced by Dr. Barnum as his wife, and who signed and acknowledged the deed, was not the wife as represented ; but some time thereafter, and after hearing that the woman was not the wife of Dr. Barnum, but his kept mistress, and there being a rumor in the neighborhood to that effect, Dr. Barnum went to the witness and apologized for having deceived him, in intro-

ducing Caroline Butler as his, Barnum's wife; and then stated that Caroline Butler was not his wife, and that he had never been married to her. Similar statements and declarations were repeatedly made, not only to Hudson, but to Harris, to Dr. Cooper, to Mrs. Overton and others. These statements were made by Dr. Barnum time and again, both before and after the death of Caroline Butler; and they were frequently accompanied with the further statement that the child, John, was illegitimate, and that he intended to apply to the Legislature for an Act to legitimate him; that he had not married Caroline, and never intended to marry her. The testimony of Mr. Harris, and Dr. Cooper, with whom Dr. Barnum seems to have been on terms of intimacy, is full and explicit to these facts.

Of the several witnesses examined in Arkansas, all of whom having been well acquainted with Dr. Barnum, there is but one who says he ever heard Dr. Barnum admit or allude to the marriage spoken of by Calvin Burrows, and that witness is Moses Overton. He says that Dr. Barnum told him that he, Barnum, had married Caroline Butler, at Manchester Bluff, and that the marriage took place before the child John was born. But when we compare the evidence of this witness with that of his wife, Mrs. Overton, as to declarations and statements of Dr. Barnum made to her, we think there is great reason to suspect that Moses Overton labors under some misunderstanding or mistake as to what he did hear from Dr. Barnum, on the subject. Mrs. Overton states explicitly, that Dr. Barnum, in her own house, and when he was perfectly sober, declared to her, after Caroline Butler's death, that he had never married Caroline, and that he had never thought of so doing, because she was not his equal. She further states, that she never heard of the marriage at Manchester Bluff, and that Dr. Barnum and Caroline Butler were not generally reputed or acknowledged to be man and wife, though they acted toward each other as if they

were such.   This evidence of Mrs. Overton is in perfect accord with that of Mr. Harris, Dr. Cooper, Mr. Hudson and David McLaughlin.

According to the evidence of one of the witnesses, when Dr. Barnum was about leaving North Carolina with Caroline Butler, he declared his intention to pass her off as his wife; and it would appear that he was desirous of carrying out that purpose; for upon their arrival in Arkansas they cohabited as man and wife, and he allowed her to be called Mrs. Barnum, and hence the impression was at first produced that they were really married.   But upon leaving Arkansas in 1841, Caroline no longer bore the name of Barnum; and on their arrival in Baltimore, Dr. Barnum represented Caroline to Andrew McLaughlin as being the wife of his, Barnum's, overseer.   She was then sick, and instead of being taken to the hotel among the family of Dr. Barnum, and where he himself went, she was taken with her child to a boarding house in the city, where she remained sick until she died a few months after. She never was in the hotel where Dr. Barnum himself boarded and lodged; and she was never in any manner received or recognized by the members of his father's family as his wife.   On the contrary, she was known simply as Caroline Butler, and it seems to have been well known and understood among Dr. Barnum's family that she was his kept mistress, by whom he had children.   And all of Calvin Burrow's statement as to the manner in which Caroline Butler was received by the Barnum family, and where she was taken upon her arrival in Baltimore, and as to her visit to David Barnum's country seat, would seem to be mere fiction.

It appears that Mrs. Barnum, the mother of Dr. Barnum, understanding her son's relation to Caroline, procured for the latter lodging for herself and child, and provided them with their food.   Caroline was at first introduced at the boarding house as a widow with a child,

but that statement was soon corrected, and Mrs. Barnum herself informed Mrs. Bayzand, the keeper of the boarding house, that Caroline was not married, and that the child was illegitimate ; to which Mrs. Bayzand replied that if she had known that at first she would not have received Caroline in her house, but she was then too ill to be removed.    There is one fact that cannot fail to be observed, and that is, that upon no occasion, nor under any circumstances, is Caroline ever shewn to have held herself out as or claimed to be the wife of Dr. Barnum, except in the single instance of signing and acknowledging the deed at Manchester Bluff, in 1839.    Nor did Dr. Barnum treat her as his wife after leaving Arkansas.    While she was in Baltimore, sick, and in her last illness, he visited her but seldom, and then only for a few moments at a time. He was not present at her death, nor does it appear that he even attended her body to the grave.    She died and was buried as Caroline Butler—no person then assuming that she had ever been married.

Mrs. Barnum, the mother of Dr. Barnum, who was kind and attentive to Caroline in her sickness, may well be supposed to have known and fully understood the relation that existed between her son and the poor unfortunate woman ; and touched by the distressed and forlorn condition of the mother, and feeling a deep solicitude for the child, that good lady made earnest effort to induce her son to marry Caroline before she died.    He promised to do so ; and the time was fixed, the attendance of a Minister of the Gospel procured, but death intervened before Dr. Barnum appeared to redeem his promise.

Now, why this proposal of marriage, and this promise to marry, if a previous marriage had taken place ?    If a previous marriage had occurred between the parties, no person can suppose for an instant that Mrs. Barnum would not have been informed of it, if not by her son, certainly by Caroline herself.

Nor is this all.   Mrs. Barnum always spoke of the child as illegitimate.   She so spoke of him to the members of her own family, to Mrs. Bayzand, and to Mr. Rockwell.

The declarations and statements of Mrs. Barnum, as to the relation of her son and Caroline Butler, and the illegitimacy of their child John, as testified to by different witnesses, have been excepted to, as being but hearsay, and therefore inadmissible.   But it is one of the well recognized exceptions to the general rule excluding hearsay evidence, that in matters of pedigree, embracing marriages and births, hearsay is admissible, provided it proceed from persons who are " *de jure* related by blood or marriage to the family in question, and who, consequently, may be supposed to have had the greatest interest in seeking, the best opportunities for obtaining, and the least reason for falsifying, information on the subject."   1 *Taylor's Evi.*, 575.

Here Mrs. Barnum is dead, and the declarations given in evidence were all made *ante litem motam*.   Her declarations as proved by the witnesses are admissible—certainly upon the question of marriage of her son—and if not as *directly* proving the bastardy of John R. Barnum, who, though *de facto* her grand-son, was *de jure* a stranger to her, they are at least admissible to show that the boy was not the legitimate son of Dr. Richard Barnum. *Stevens vs. Moss, Cowp.*, 593.   And of these facts the *general repute in the family,* proved by surviving members of it, is held admissible.   *Doe vs. Griffin,* 15 *East,* 293.

But if Mrs. Barnum's declarations were all excluded, it would in no manner affect the conclusion to be drawn from the other evidence in the cause.   Dr. Richard Barnum himself, over and over again, both in Arkansas and in Maryland, to strangers and to the members of his own family, declared that the boy John was illegitimate, and that he had never been married to the mother, Caroline Butler.   These declarations are not only competent evidence, (*Stevens vs. Moss, Cowp.*, 591 ; *Hargrave vs. Har-*

*grave,* 2 *C. & K.,* 701; *Crawford vs. Blackburn,* 17 *Md.,* 49,) but they proceeded from a source certainly well informed upon the subject, and, in the absence of all apparent motive to falsify the truth, they must be accepted as reliable.

But to all the evidence to which reference has been made, there is still another fact to be added, which is of the most conclusive import, and that is the Act of the Legislature of the State of Arkansas, in 1853, whereby it was enacted that John Rockwell Barnum was thereby constituted a legal *heir* of Richard Barnum, and repealing all laws inconsistent therewith. Why apply to the Legislature and procure the passage of such an Act, if John R. Barnum was the legitimate son of Dr. Richard Barnum? It was in reference to procuring such an Act that Dr. Barnum spoke to Dr. Cooper, Mr. Hudson, Mr. Harris, Dr. McLaughlin, and others. If there had been a marriage between Dr. Barnum and Caroline Butler, the Act would have been wholly useless and futile; for if the child had been born before marriage, but recognized by the husband after marriage as his, by the law of Arkansas, existing at the birth of the child John, and still existing, such child was declared legitimate. *Ark. Code, chap.* 56, *sec.* 4, *p.* 436. According to the terms of the Act, there could have been but one object in having it passed, and that was to impart inheritable capacity to John R. Barnum to take from Richard Barnum, as far as the Legislature of that State could do so. That such an Act would ever have been applied for and obtained, if John R. Barnum had been the legitimate son of Dr. Richard Barnum, it is next to impossible to believe.

There are two facts, however, much relied on by the claimants, to which reference must be made. These are the memorandum enclosing the lock of hair, and the inscription on the grave-stone. When the memorandum enclosing the hair was made, is uncertain; it must however

20                    v. 42.

have been made after 1845, as it was in that year that Dallas County, mentioned in the memorandum, was formed. The hair was retained as a memento for the son, as the memorandum is addressed to him; and it was not unnatural that the mother should have been mentioned as Caroline Barnum, as if she had been in truth the wife of the father. And as to the inscription on the grave-stone, that was made in 1859, about eighteen years after the death of Caroline Butler. Her remains were taken from their original resting place, and transferred to Mount Olivet Cemetery, in 1859, and it was then that the inscription was made, and after the commencement of a litigation in the result of which any legitimate child of Dr. Barnum would have been most deeply interested. Why, or under what motive it was done, it may be difficult rightly to conjecture. The evidence, however, in disproof of marriage, is altogether too strong and irresistible to be overcome by that inscription, and the other circumstances relied on by the claimants.

And such being the case, while we have had a strong disposition to maintain the claim of John R. Barnum, we have been forced to the conclusion that he was not legitimate.

But it is contended, that notwithstanding there may have been no marriage between Dr. Barnum and Caroline Butler, yet, by the operation of the Act of the Legislature of Arkansas, before referred to, John R. Barnum was rendered legitimate, as if a valid marriage had taken place, and was therefore capable of taking whatever right that would or could devolve on any legitimate child of his father; that the Act was retroactive, and related back to the time of the birth of the child declared to be heir.

In this, however, we do not agree with the counsel of the claimants. As we have seen, the Act makes no reference to any marriage, and in no sense could operate to confirm any defective or imperfect marriage. Its opera-

tion does not even depend upon the fact that John R. Barnum was the child of Richard Barnum. It simply, by force of the law itself, and not of the circumstances of birth or relationship, gave to John R. Barnum a personal *status*, with capacity to inherit from Richard Barnum as heir. This Act could have no extra-territorial operation whatever, except as to any rights that may have been acquired under it, in the State of Arkansas. As to such rights they would be respected everywhere. *Sto. Confl. L.*, secs. 101, 102. But as to capacity to acquire property beyond the State passing the Act, by virtue of the particular *status* given the party, that the Legislature could not confer. Even if the Act had professed to legitimate John R. Barnum, without reference to previous marriage, it could have no operation here, and no rights involved in this case could be affected by it. This would seem to be clear both on reason and authority. 5 *Com. Dig. Parliament,* (*K*,) *p.* 301; *Birtwhistle vs. Vardill,* 5 *B. & Cr.,* 438; *Houlditch vs. Marquess of Donegall,* 2 *Clark & Finn.,* 476; *Smith vs. Derr's Adm'rs,* 34 *Penn. St.,* 126; *Sto. Confl. L.,* secs. 87, 87a.

The claim, therefore, made in the right of John R. Barnum, must be rejected.

2. The next question raised on the exceptions to the special auditor's accounts, and now to be considered, is that in respect to the disposition of two parts of the estate devised or bequeathed under the second clause of David Barnum's will—two of the legatees for life having died since the death of the testator, without children or descendants. The first clause of the will, as we have before stated, has been declared void, because it violated the rule against perpetuity; and upon that clause failing, the second clause, which was intended as an alternative clause to the first, has been declared to be operative as to the City Hotel buildings and grounds. 26 *Md.*, 119.

The testator, by the second clause of his will, directed, in the event that his views as expressed in the first clause

should be disappointed, so that a sale of the hotel buildings and grounds should take place during the life of any of his children, that the proceeds of sale should be invested in mortgage, ground rents, or the debt of the United States, or of the City of Baltimore, and that, subject to the payment of one-third of the income of the investment to his wife for her life, " the said investment shall be for the benefit of my children during their lives, and after their death shall be the property, for the shares of the decedents, of their *respective* children or descendants, *per stirpes;* the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stirpes,* the shares to which, if they had lived, the deceased would have been entitled."

The testator, at the date of his will and at the time of his death, had five children living—three sons and two daughters. Of these children but one survives, and of the four deceased, two left children, and the other two, Ephraim K. Barnum and Richard Barnum, never had lawful issue or descendants. By the first clause of his will, the testator gave the rents of the hotel establishment, as he had directed it to be leased from time to time, to his five children by name, and their respective heirs, *per stirpes.*

As by the second clause of the will, the testator, upon the failure of the first clause, which was void *ab initio,* contemplated that a sale should be made of the hotel buildings and grounds, and the proceeds invested as directed by him, the conversion in the manner directed must be regarded for all purposes as effected at his death, upon the principle that equity considers that as done which is required to be done. 26 *Md.*, 178; *Beauclerk vs. Mead,* 2 *Atk.*, 167; *Robinson vs. Robinson,* 19 *Beav.*, 495; *Craig vs. Leslie,* 3 *Wheat.*, 563; *Cropley vs. Cooper,* 19 *Wall*, 167. And as it is of the proceeds of sale that life estates are expressly given to all the children of the testator, with

remainders to the grand-children or descendants, *per stirpes*, until the property was actually sold, it stood in lieu of the investment of the proceeds, and in no manner prevented the estates from vesting in the legatees.

Two of the legatees for life having died without children or descendants to take in remainder, the question is, who is entitled to the shares of those two legatees for life, and how have those shares been disposed of, in default of parties to take in succession, after the exhaustion of the life estates, as provided in the second clause of the will?

It is contended by the complainants, and those claiming similar interests, that the clear intention of the testator was, as gathered from all the provisions of the will, that after the exhaustion of the life estates limited to his children, the residue should be confined to his family and descendants; and that the only construction by which that intent can be gratified, is that by which the grand-children *in esse* at the death of the testator take as a class, and *per stirpes, inter sese.* While on the other hand it is contended that, by the second clause of the will, no disposition is made of the remainder, in the case of a child dying without descendants, and that, by the seventh or residuary clause, all the rest and residue of the testator's estate of every kind, not otherwise disposed of, was given, less the provision therein made for his wife, to and among all his children, or their heirs, as tenants in common, share and share alike.

As to the testator's children, the legatees for life, it is very clear, we think, that they did not take as a class simply, with reciprocal right of survivorship. They had been named specifically in the preceding clause of the will, and when the testator speaks of his children in the second and alternative clause, he must be taken as referring to the children previously named. They are described, it is true, as his children, but by reference they are individualized, and there is nothing uncertain as to the particular

persons in contemplation ;. and they took, not as joint tenants, but as tenants in common for life.   The language of the will is, "that the investment shall be for the benefit of my children during their lives, and after their death, shall be the property, *for the shares of the decedents*, of their *respective* children or descendants, *per stirpes*."

This language clearly imports severance or plurality of interests, and thereby constituted the children of the testator tenants in common for life.   In the case of *Moore's Settlement*, 10 *W. R.*, 315, it was held, that under a gift to the testator's brothers and sisters, "or their executors or administrators *respectively*, the brothers and sisters took as tenants in common."   *Hawkins on Wills*, 112.

But with respect to the persons to take in remainder, the same rule does not apply.   The gifts in remainder are not to legatees *nominatim*, or to any definite number, but the description of the objects of the bounty is made by the use of the collective terms, "children or descendants," thus making the gifts to classes, the individual members of which were indefinite.   The common instance of such gift is where a testator gives to his children generally as a class, without name or number, whether as joint tenants or tenants in common ; in which case the objects composing the class at the testator's death, whatever be their number, and whenever born, are entitled ; and the fact of the gift being to them as *tenants in common,* will not prevent a single object representing the class from taking the whole.   *Stewart vs. Sheffield*, 13 *East*, 526 ; 2 *Pow. on Dev.*, 327.   This is a well settled rule of construction, and has been acted on by this Court in the case of *Young vs. Robinson*, 11 *Gill & John.*, 328.

Here, as we have seen, the classes are described simply by their relation to the legatees for life, and every person answering the description at the death of those respective legatees for life is entitled, although not in *esse* at the death of the testator.   Each legatee for life was made the

stock or fountain of a distinct and separate class to take in remainder the share to which the legatee for life was entitled. These shares are distinct and separate estates, and as between the legatees for life, or the classes to succeed them, there is no express or implied reciprocal limitations, or successive interests whatever. See case of *Hodgson's Trust,* 1 *Kay & J.,* 178.

But as there is no gift or bequest over in the events that have happened, of two of the legatees for life dying without children or descendants, the question is, how are those shares or interests disposed of, if disposed of at all, under the will?

The testator, by the seventh or residuary clause of his will, gave and devised all the rest and residue of his estate, of every kind, not therein before disposed of, less the provision in favor of his wife, to and among his children and their heirs, as tenants in common, share and share alike.

The property here in question is not real estate, but is personal; nor is this the case of a void devise or bequest; but is the case of property not otherwise disposed of by any provision in the will. Why then should it not pass under this broad residuary clause?

There is always a strong disposition in the Courts to construe a residuary clause so as to prevent an intestacy with regard to any part of the testator's estate, unless there is an apparent intention to the contrary. As was said by Sir Wm. Grant, in *Leake vs. Robinson,* 2 *Merv.,* 392, with regard to personal estate, everything which is not well given by the will falls into the residue; and it must be a very peculiar case indeed, in which there can at once be a residuary clause and a partial intestacy, unless some part of the residue itself be not well given. It is immaterial how it happens that any part of the property is undisposed of—whether by the death of a legatee, or by the failure of the testator to provide for all the events that may happen

upon which the bequest may depend for its complete effect. And here as we find nothing in the second clause of the will, or in any other clause of it, to raise an implication in favor of vesting such remainders in the other children or their descendants, otherwise than through the residuary clause, we can have no difficulty in determining upon the comprehensive terms of that clause, that such remainders passed under it, as residue not before disposed of, and became vested, the one-third part thereof, being personalty, in the wife, and the other two-thirds in the testator's children, as tenants in common.

Where a particular estate or interest is carved out, with a gift over to the children of the person taking that interest, as in this case, such gift over will embrace not only the objects living at the death of the testator, but all such as may subsequently come into existence before the period of distribution ; *Middleton vs. Messenger,* 5 *Ves.,* 136 ; and in such case, the children, if any, living at the death of the testator, take an immediate vested interest in their shares, subject to the diminution of such shares, that is, to their being divested *pro tanto,* as the number of objects is increased by future births, during the life of the legatee for life.   2 *Pow. on Dev.,* 303 ; *Taylor vs. Mosher,* 29 *Md.,* 443 ; *Oppenheim vs. Henry,* 10 *Hare,* 441 ; *Baldwin vs. Rogers,* 3 *D. M. & G.,* 649.   And, in such case, in the event of there being no objects in existence at the death of the testator to take in remainder, such remainder falls into the residue, until objects come into existence, when they take by way of executory bequest.   *Weld vs. Bradbury,* 2 *Vern.,* 705.

For these reasons, we are of opinion that the Court below was correct in sustaining the exception taken by the defendants, the McLaughlins, to the special auditor's accounts, because of the manner in which the share of the estate of which E. K. Barnum, deceased, was legatee for life, was treated therein ; and the same reason applies as

to the share of which Richard Barnum was legatee for life. Both of these shares fell into the residue, and passed under the residuary clause of David Barnum's will.

3. We next come to the question as to the time down to which allowance should be made to the defendants representing Andrew McLaughlin, for the meliorations and permanent improvements placed on the hotel buildings by Andrew McLaughlin in his life-time. This question is raised both by an appeal from the decree of the Circuit Court of the 26th of May, 1870, under which the accounts have been stated, and by an exception to those accounts; and which exception was overruled by the Court below, and in so doing we think there was no error.

By the decree of the 26th of May, 1870, passed in strict conformity to the opinion of this Court, (31 *Md.*, 425,) the special auditor was directed "to take an account of the amount of allowance to be made for the meliorations and improvements of said property, made by Andrew McLaughlin, since the death of David Barnum and *prior to the filing of the original bill in this cause.*" Nearly all the permanent improvements by McLaughlin, if not quite all, for which allowance has been made, were placed on the property during the years of 1856, 1857 and 1858; and the bill in this cause was not filed until the 8th of March, 1861.

It has been strongly urged by the complainants, and those claiming similar interests with them, that McLaughlin had actual notice of their rights and claim long before the bill in this cause was filed, and before he made the improvements for which allowance has been made; and that they are not precluded by any previous decision of this Court from claiming the full benefit of that notice on this appeal. The notice of their rights and claim, as they insist, was given to McLaughlin by a bill filed by the present complainants in the Circuit Court of the United States, for the District of Maryland, on the 28th of August, 1854.

That bill was not prosecuted, but the suit was allowed to abate in 1862.

When this cause was here in 1869, (31 *Md.*, 425,) the appeal was taken from an interlocutory decree, settling the principles upon which an account was to be stated;— an appeal from such an order or decree being allowed by the 21st section of Art. 5, of the Code. In the transcript of the record then before us, the bill filed in the United States Court did not appear, but only the docket entries of such a suit. There was nothing to show the nature of the allegations of that bill, or the character of the right asserted by it. And consequently this Court, in declaring the principles that should govern in stating the account for meliorations and improvements, had no reference whatever to that bill. The question of the right to the allowance, and the time down to which the allowance should be made, were among the most material questions on that appeal; and this Court then decided, and which decision must be taken as conclusive, that for all permanent improvements and meliorations placed upon the property since the death of David Barnum, and prior to the filing of the original bill, meaning of course the original bill in this cause, an allowance should be made. Nor should we have decided differently if the bill filed in the United States Court had been before us. That bill, as it now appears, was filed upon the supposition and theory that the first clause of David Barnum's will was perfectly good and operative, and that the rights of the complainants resulted from a construction thereof, and not of the second clause of the will. That first clause of the will has been declared void, and of course the supposed rights founded on its construction fell with it. And although the same rights resulted to the complainants by the second clause of the will, yet, in order to have asserted those rights, an amendment of the bill would have been required. The bill, therefore, as it was filed in the United States Court,

gave no specific notice of the rights of the complainants as presented in their present bill; but on the contrary, conceded that McLaughlin was rightfully in possession of the premises, under Zenus Barnum, the lessee. We should not, therefore, have been disposed to regard that bill as sufficient notice of the assertion of the present claim by the complainants, founded on another provision in the will, to justify the Court in depriving McLaughlin of all right to compensation for his permanent improvements of the property. In his relation to the property and to the complainants, he not only held the rights and the position of the legatees for life, whose interests he had purchased, but he was absolute owner of nearly three-fifths of the entire estate. He was not, therefore, in any proper sense, a *mala fide* possessor; and it would be unjust and inequitable in the extreme, under the circumstances of this case, to allow the complainants and others to take the benefit of the permanent improvements, in the enhanced value of the property, without making compensation therefor; as by so doing the property and money of one party would be appropriated to the profit of another, without consideration, and where there has been no real default. The Court below, therefore, was entirely correct in overruling the exception to the auditor's accounts in this particular.

4. The next question raised on the exceptions to the special auditor's accounts, is one in respect to the deduction of one-third of the rents ascertained from October, 1853, down to the death of Mrs. Ann K. Barnum, in 1866, as and for her proportion of such rents.

By the second clause in the will of her deceased husband, Mrs. Barnum was entitled to the one-third of the income to arise from the investment of the proceeds of sale of the hotel buildings and grounds, during her life, and as the property stood in the place of the investment that was directed, she, of course, was entitled to the one-third of the rents during her life. It is insisted, however, that as

she received from McLaughlin, from 1853 down to the time of her death, the sum of $17,242.10, at different times, and demanded no more, but was satisfied with that sum, that no other or greater sum should be allowed ; and that after deducting the sum thus actually paid from the $69,388.12, her proportion of the rents, the balance ought to be added to the sum for division among the parties in interest. But this is not our view of the case. Mrs. Barnum had a distinct interest in the rents of the property, so long as it remained unsold ; and that interest she could have disposed of as she thought proper. Whether she did assign or dispose of it, or whether she agreed upon a special rental in respect of it, we are not now called upon to decide. Mrs. Barnum is dead, and there is no representative of hers before the Court. But it is quite certain that these complainants, in this proceeding, have no right or standing to claim the proportion of the rents awarded to Mrs. Barnum. If she did not dispose of her interest, or if she made no contract in regard thereto, then her proportion of the rents, less the amount that she received thereon, form part of her estate, and may be claimed by her personal representatives. The complainants here are suing for their own individual rights under the will, and they are entitled to demand those rights, and nothing more, and those rights are, in respect to the rents, the one-fifth part thereof, after deducting the one-third during the life of Mrs. Barnum, whose estate is also entitled to the one-third of two-fifths of such rents in respect of the two shares that fell into the residue, from the time of the death of E. K. Barnum and Richard Barnum, respectively, to the time of sale. We therefore concur with the Court below in overruling the complainants' exceptions in this particular.

5. We next come to the exceptions taken to the accounts, because of the manner in which the special auditor proceeded to ascertain the enhanced vendible value of the hotel buildings and grounds at the time of sale,

by reason of the meliorations and improvements placed thereon by McLaughlin; and because of the manner in which the evidence of certain witnesses were estimated in arriving at conclusions and results.    These questions are embraced by several of the exceptions, both on the part of the complainants and the defendants, and have been much discussed in the course of the arguments at bar.

When this case was here on a former appeal (31 *Md.*, 425,) this Court was specific in its direction as to the manner of taking the accounts, as well of the rents and profits as of the meliorations and improvements.    That direction was, that the account for rents and profits should be taken from the time the complainants' title accrued, down to the day of sale under the decree, on the basis of a reasonable yearly occupation rent of the premises, in the condition in which they were left by David Barnum, (the occupier or tenant making the necessary repairs,) *without regard to any meliorations or permanent improvements made thereon during any part of that period;* and that the amount of allowance for meliorations and improvements should be estimated by the extent to which those improvements may have enhanced the *vendible value* of the property at the time of sale under the decree; such vendible value to be fixed by the price obtained for the property at the sale.    This was certainly plain and explicit.    And if this plain direction had been more constantly kept in mind and conformed to, in the examination of the witnesses upon this subject, than would seem to have been done, we should, doubtless, have had much less complication in the case than we have.    But we think, nevertheless, that the special auditor was substantially correct in his manner of dealing with the subject, and that the Court below was right in sustaining this part of his report.

In arriving at conclusions in reference to the amount of enhancement of vendible value by the meliorations and improvements, the first question to be answered was, what

would have been the vendible value, on the day of sale, of the hotel buildings and grounds, taken as a whole, as left by David Barnum, assuming them to have been kept in substantial repair? and not what was the value of the ground, and what the value of the buildings, separated. This first question answered, the next question was, how much did the meliorations and permanent improvements add to the *vendible* value of the hotel property, *as it was sold?* and this last question is virtually answered by the price obtained at the sale, if that sale was fair, and the property sold for its marketable value. If, in the opinion of witnesses competent to speak upon the subject, the real vendible value of the property was not enhanced by the improvements, and the property, in its condition as left by David Barnum, would have sold for as much, at a fair sale, as was actually realized by the sale made on the 15th December, 1870, then, of course, no allowance should be made for improvements ; while, on the other hand, to the extent that those improvements are shewn to have enhanced the *vendible* value of the pro-perty, *as it was actually sold,* allowance should be made. And this we understand to be the principle that governed the special auditor, in making the estimates and stating the account.

But it is insisted that the auditor, in making the esti-mates stated by him, gave weight and value to evidence that ought to have been disregarded, and altogether ex-cluded from consideration. The evidence specially objected to, as being of the character to be excluded, is that given by John West, Allen R. Barnum, and Starkweather, the architect. But upon a careful examination of the testi-mony of those witnesses, we think the auditor was entirely correct in including their estimates in the average of the estimates of the various witnesses who testified upon this subject. The witnesses, whose testimony is objected to, had special means of knowledge that few other witnesses

possessed, and with respect to some of the elements in the estimate, were most proper. Two of them had been engaged in conducting the particular hotel, and were hotel-keepers by profession, and the other was the architect who made all the estimates for, and superintended the improvements made on the establishment, the allowance for which is the subject of controversy. It is also objected that the special auditor did not give due weight to Mr. Gelston's testimony. But we do not know what greater weight could have been given than was allowed it by the auditor, unless it had been adopted to the exclusion of the evidence of the other witnesses. His estimate, though it may perhaps be regarded as an extreme one, was placed among the estimates of the several other witnesses for average, and, in that mode, the complainants received the full benefit of his evidence. It is very true, the method of reaching a result by averaging the estimates of a number of witnesses, upon a question of value like the present, where there may be a great diversity of views and opinions, and the witnesses unequally informed, does not ensure entire certainty, nor always entire satisfaction. But, as is well stated by the special auditor, it is the only method which the nature of the case admits of, and is in accordance with usage and precedent, which hold that the most reliable and safe method of approximating the truth in such cases, with the least risk of falling into gross error, is that of taking the average of all the opinions expressed, rather than that of selecting any one to the exclusion of all others. See the case of *Jones vs. Jones,* 4 *Gill,* 87. The average of the estimates in this case, excepting that of Mr. Broumel, would appear to be in all respects fair and proper ; and as to the estimate of Mr. Broumel, we think the Court below was correct in excluding it, for the reasons stated in its opinion. The estimate of no witness should be included in the addition for average, whose testimony, if it stood alone, could not be relied

on by the Court, as the foundation for its decision of the question.

6. The special auditor's accounts are excepted to on various other grounds ; among these that he did not consider and treat the rental from year to year, accruing to the complainants, as having been applied to the making of the improvements on the original buildings, and thus entitle them to rent on the improved hotel, instead of the hotel as left by their grandfather. But such a mode of stating the accounts would have been a clear departure from the directions of the decree, and there is no equity shewn, in the facts of the case, that requires the accounts to be so stated.

Nor was the exception well taken to the accounts, that the auditor did not charge as against the vendible value of the improvements placed on the property by McLaughlin, any fair proportion of the ground-rent on the hotel property. The decree, directing the accounts, did not contemplate such a charge, and, under the circumstances of this case, there is no equitable ground for it. And equally without foundation is the exception to the accounts, that the auditor, in stating the account of the rents did not state it with annual rests, and charge interest on the yearly balance thus ascertained. This would not have been in accordance with the decree under which the accounts were taken, and, moreover, this is not a case for such mode of stating the account ; and the Court below was therefore correct in overruling the exceptions in all these particulars.

7. By their fourth exception to the accounts, the complainants insist, that the special auditor, instead of deducting the annual interest on the stock-debt, constituting a charge on the premises, from the rentals as ascertained, year by year, down to the time of the sale, should have applied such rentals to the redemption or extinguishment of the stock-debt, to the relief of the property ; and that

the shares of such stock-debt, amounting to $10,200, purchased and held by McLaughlin, should have been treated as paid and extinguished, except as to the sum actually paid therefor. For this there was no warrant in the decree under which the accounts were taken, nor is there any as matter of right.

The stock-debt constituted a charge upon the hotel premises, and each party, taking under David Barnum's will, took his interest subject to that charge. McLaughlin, while he occupied the position of tenant for life, under the father of the complainants, was only bound to keep down the interest, and was not required, as such tenant, to redeem or take up the principal for the benefit of the estate. After the extinction of the life-estate, and McLaughlin became tenant in common with the complainants, as to the remainder of the estate, then each party was bound to pay his own proper proportion, not only of the interest, but of the principal of the incumbrance; and if McLaughlin did in fact pay all the interest that accrued on this charge, he is entitled, by way of contribution from his co-tenants or co-owners, to reimbursement to the extent of their interest; and that reimbursement is made in the shape of credits on the rent account. He was under no obligation to redeem or pay off the stock-debt, for the relief of the common estate; and if he did purchase any portion of the debt, the presumption is that he purchased it for his own benefit, and with no view to exonerate the estate. *Burrile vs. Earle of Egremont*, 7 *Beav.*, 205. This presents no analogy to the case alluded to in argument, where two devisees are in possession of land under an imperfect title, devised to them by their common ancestor, and one of them buys up an outstanding or an adverse title, for the purpose of disseizing or expelling his co-tenant or co-devisee. In such case the purchase will enure to their common benefit, subject to an equal contribution to the expense. *Van Horne vs. Fonda*, 5 *John. Ch.*, 388.

The Court would not allow such an advantage to be taken, because it would be in violation of good faith, amounting to a fraud. Here there could be no such pretence. The purchase of the stock could in no manner prejudice the rights of the other parties in interest.

We think, therefore, that the exception to the accounts on this ground was also properly overruled by the Court below.

8. An exception has also been taken, that the special auditor did not take an account of the hotel furniture left at the death of David Barnum, appraised at $25,000, and apply the appraised value thereof to the extinguishment of so much of the stock-debt, or treat the appraised value of the furniture as so much money in the hands of McLaughlin, with which to redeem that debt, and thus relieve, to that extent, the proceeds of sale of the hotel premises. But the simple answer to this exception is, that we have nothing to do with the furniture in this proceeding. The furniture was not embraced in the description of the property operated upon by the second clause of David Barnum's will, and forms no part of the estate to be brought into the accounts in this cause ; and the complainants' bill, so far as it sought an account of the furniture has been dismissed. This furniture, we must suppose, has been, or will be administered as part of the personal estate of David Barnum ; and if McLaughlin appropriated and used the furniture, as it appears he did, he or his representatives may have accounted therefor, or may be held liable so to account, to the personal representatives of David Barnum. Those representatives are not now before this Court, and we can make no decree in this cause that would affect their rights. The exception, therefore, was properly overruled.

9. There is also an exception to the accounts of the auditor, because of the amounts of taxes allowed as deductions from the annual rents ; and this exception we think was well taken, and the Court below was in error in overruling

it.   With the money in hand with which to pay, there is no principle upon which McLaughlin could be allowed for either interest paid, or the discount he received for prompt payment of the bills as they were presented.   The allowance should have been for only such amounts as were actually paid, less the interest, in cases where, by delay, interest was paid on the original amounts of the bills.

10.   There is also an exception by the defendants, the McLaughlins, because of the non-allowance for insurance. There was no evidence, it seems, produced before the auditor upon this subject, and hence no allowance was made ; and the exception will avail only because the accounts have to be remanded to the auditor, for re-statement for other causes.   Parties are bound to produce their evidence in due time, and having neglected it, the Court will not open the accounts at the instance of the party in default.   But here, as the cause has to be remanded, we can perceive no good reason why the defendants may not be allowed to produce their evidence to entitle them to a credit for any such proper insurance as covered and protected the interests of the complainants, and others in interest.   We therefore concur in the action of the Court below in respect to this exception.

11.   The complainants, and some of the defendants, except to the competency of Daniel Dorsey as a witness to testify on behalf of the defendants, the McLaughlins ; and also to certain portions of his evidence as being inadmissible, because founded on books and accounts which were not produced.

As to the competency of the witness, we can perceive no good ground for the exception.   Mr. Dorsey is not a party to the cause, nor was he produced to testify in support of any interest of his own of a nature to render him incompetent as a witness, under the Acts of 1864 and 1868, as against the exceptants.   But as to such portions of his evidence as appear to be founded upon, and are the mere

statements from books and accounts, which were not produced, they ought to be excluded. It is clearly incompetent for a witness to speak of the contents of books and accounts not produced, and where the adverse party has no opportunity to cross-examine in regard to them. Such books and accounts should be produced, to speak for themselves, as the best evidence, if within the power of the party desiring the proof, and if not within his power, a proper foundation should be laid for the introduction of secondary evidence of their contents. No such foundation appears to have been laid in this case, and hence, all such parts of the evidence of the witness as relate to the contents of books, or the state and condition of accounts, should be excluded.

12. We come lastly to an exception by the complainants, and some of the defendants, to the action of the Court below, in allowing James D. Gilmour, one of the witnesses examined before the auditor, to appear in open Court, and there to correct his previous testimony, by answering over a particular interrogatory, propounded by the direction of the Court. This is a practice not very often resorted to, and is one of great delicacy, because of its being liable to abuse. If, however, the Court is entirely satisfied, upon a preliminary examination of the witness, that there is a real mistake, and that there is no collusion, it will permit, what was done in this case, the witness to correct his testimony. For this there are many precedents in the books. *Byrne vs. Frere*, 1 *Moll.*, 396; *Kirk vs. Kirk*, 13 *Ves.*, 286; *Denton vs. Jackson*, 1 *John. Ch.*, 526; *Gray vs. Murray*, 4 *John. Ch.*, 413; 2 *Danl. Ch. Pr.*, 1151. But from the determination of such a question by the Court below, no appeal will lie; for that Court must, in the nature of things, be the best judge of the propriety of granting or refusing such an application.

Having thus gone through the case, and passed upon all the questions raised for decision in this Court, it

results, from what we have said in regard to some of the exceptions, that the order appealed from must be reversed; and upon such reversal the cause will be remanded, to the end that the Court below may pass an order referring the case back to the special auditor, with directions to state accounts in accordance with the foregoing opinion. The costs of both appeals in the present record to be paid out of the fund.

*Order reversed, and*
*cause remanded.*

(Decided 29th April, 1875.)

STEWART, J., dissented as to the legitimacy of John R. Barnum, and as to the construction of the second clause of David Barnum's will.