# ELIZABETH WEBER et al. *vs.* CHRISTINA LAUMAN.

*Mistake in Agreed Statement of Facts—Permanent Improvement of Estate by Life-Tenant and Remainderman—Evidence as to Payment by One of Two Mortgagors.*

Where counsel have filed an agreed statement of facts respecting the rights of the parties to a sum of money in court for distribution, one of the parties may subsequently show that he entered into the agreement under a mistake as to the facts, and the court will then require the facts to be established by evidence.

A life-tenant of real estate who makes permanent improvements thereon, has no power to charge the estate in remainder with the cost of the same, without the consent of the remainderman.

The life-tenant of a parcel of land united with the remainderman in executing a mortgage to secure the payment of money borrowed for the purpose of making improvements thereon. A promissory note for the amount of the loan was made by the mortgagors jointly and severally. Certain payments to the mortgagee were made on account, the receipts for which were in the name of the life-tenant but it was alleged that some of the payments were made with money belonging to the remainderman. After the death of both life-tenant and remainderman a sale was made under the mortgage, and the question in this case was as to the distribution of the surplus left after payment of the mortgage. *Held,*

1st. That the life-tenant and the remainderman were each liable for one-half the mortgage debt, there being no evidence of any agreement between them other than that contained in the mortgage and the note.

2nd. That the testimony shows that certain payments were made with money belonging to the remainderman, and that consequently his estate should be credited with the same.

Appeal from a decree of the Circuit Court for Howard County, (JONES J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER JJ.

*Beverly W. Mister* and *Edward T. Jones*, for the appellants.

The Court should have ruled as a matter of law, that Louis Preacher was bound for the principal debt mentioned

in the mortgage. The law appears to be clearly settled that, where money is raised on an estate like this case, with the knowledge and consent of the party entitled to the remainder, such party is chargeable with the principal sum, and the life-tenant with the interest, taxes, ground rent and ordinary repairs; and if the life-tenant should liquidate any part of the principal, then, as to such part, he will be subrogated to the rights of the mortgagee as against the remainderman; and especially is this true where the property has been sold. This doctrine is not modified by the life-tenant joining in the mortgage, for in that capacity, he will occupy the position of a surety to the principal debtor, as between the two joint obligors. This relation of principal and surety, will exist, whenever it appears either from the intention of the parties or their manifest interest or holding of the property covered by the mortgage will appear. *Brown* v. *Stewart*, 4 Md. Ch. 373; *Chapman* v. *Davis*, 4 Gill, 180; *Brandt on Suretyship and Guaranty*, secs. 29, 30; *Robinson* v. *Gee*, 1 Vesey, 251; *Sefton* v. *Hargett*, 113 Ind. 595; *Gambrill* v. *Gambrill*, 3 Md. Ch. 261; *Gavin* v. *Carling*, 55 Md. 537; *Barnum* v. *Barnum*, 42 Md. 321.

This case is similar to one where an assessment is made for betterments to property, in which there is an estate in remainder, and for which the party entitled to the remainder is held solely liable for the amount, on the ground that it is in the nature of an incumbrance. *Mayor, &c., Balto.*, v. *Boyd*, 64 Md. 12. So where a mortgagee, while in possession of the mortgaged property, makes permanent improvements either with the expressed or implied knowledge of the mortgagor, he will be entitled to their value from the mortgagor. 2 *Jones on Mortgages*, secs. 1128, 1129. Where a railroad company claimed that certain lands were held by the defendants in trust, and asked that they should be required to convey the property to it, held; that the company should pay the defendants the cost of the permanent improvements put on the property by the defendants. *Case* v. *Kelly*, 133 U. S. 21.

The life-tenant having paid the ground rent, taxes, ordinary repairs and interest on the mortgage debt (besides bearing the expenses for the support of the remainderman and his wife), which annual charges undoubtedly exceeded the rental value of the property, clearly gave her an equitable right to have the principal charged to his estate. These improvements were essential for the benefit of the estate in remainder, and became essential for occupancy. Where, then, was the necessity of proving facts, which were already established by the words contained in the agreed statement of facts? Would proving that the improvements were necessary for the comfort of the parties or that the value of the interest in remainder was enhanced, be more effectual than the agreed statement of facts conveyed by the meaning of the words permanent improvements? Clearly the remainderman, having agreed to the money being used as it was, is sufficient to charge him with the debt. It was for the appellee to prove a contrary intention between the parties. In the absence of such proof it is now too late to fairly claim that she ought to be held for any part of the principal of the mortgage debt.

*Wm. G. Sykes*, for the appellee.

BOYD, J., delivered the opinion of the Court.

Anne C. Fisler and Louis Preacher, on the 19th of December, 1884, executed a mortgage to Edward A. Talbott on some leasehold property in Ellicott City, Md., for $1,190.50, which indebtedness was also evidenced by their joint and several note, payable two years after date, with interest from date, payable annually. The balance due became vested in John G. Rogers, who sold the property under a power contained in the mortgage for $1,370.00, and the sale was duly ratified. When the mortgage was given, Mrs. Fisler held a life-estate, and Mr. Preacher the remainder in the property—it having been so left to them by the last will and testament of George Preacher. Louis Preacher married the appellee after the mortgage was given.

After the ratification of the sale the case was referred to a special auditor, who stated three accounts, in all of which he first distributed the proceeds of sale to the balance of the mortgage debt and costs, and in "Account A" distributed the remainder to John G. Rogers, administrator of Anne C. Fisler; in "Account B," to Christina Lauman, administratrix of Louis Preacher; and in "Account C," to each of them equally. Mrs. Fisler survived her son, Louis Preacher, but both were dead when the sale was made. Exceptions were filed to each of the accounts, but no objection was made to the distribution to the mortgage debt and costs, but only to that of the surplus.

At the hearing of the exceptions the solicitors for the respective parties entered into an agreed statement of facts, in which it was stated that Mrs. Fisler had during her lifetime paid on account of the principal of the mortgage debt the sum of nine hundred dollars, in addition to all interest which from time to time had accrued, and that the money secured by the mortgage was borrowed and applied for the purpose of erecting permanent improvements on the property. The Court passed an order setting aside all three of the accounts and directing one to be stated in accordance with the opinion filed. The learned Judge who heard the case reached the conclusion that the mortgagors were equally liable, between themselves, for the mortgage debt, and directed that each should be charged with one-half thereof, but that, as it appeared that Mrs. Fisler had paid more than her half, her estate should be credited with the excess paid by her, and the balance be paid to the estate of Louis Preacher. After that order was passed and before another audit had been stated, Mr. Sykes, the solicitor for Mrs. Lauman, discovered, as he claims, that he had been mistaken in agreeing that Mrs. Fisler, the life-tenant, had paid nine hundred dollars on account of the principal, and that, in fact, she had not paid that amount.

Testimony was taken before the special auditor and the first question to be determined is whether that was proper,

inasmuch as the above agreement of counsel had been entered into. The amount really in dispute, as to the payments, is the sum of $607.11, which, it is claimed by the representatives of Mrs. Fisler's estate, she paid, while that is denied by the appellee. Under the evidence of Mr. Sykes and Mr. Jones, solicitors for the respective parties, we have no doubt that the Court below was right in permitting testimony to be taken to establish the actual facts, notwithstanding the agreement entered into. The fund for distribution was still before the Court and a new audit had not been made. If it be true that Mrs. Fisler had not in point of fact paid the money, which the agreement of counsel shows she had paid, her estate cannot be said to have been injured by permitting the real facts to be shown, unless it be for the reason that it is thereby deprived of what it was not entitled to. Mr. Sykes testified that Mr. Jones told him he had in his possession receipts to show that Mrs. Fisler had paid the amount stated in the agreement, and that he would get a witness to prove them, unless they were admitted, whereupon he made the agreement. He says he relied on the statement of Mr. Jones, who does not in his testimony materially differ from Mr. Sykes. Both of those gentlemen were acting in perfectly good faith—both believing not only that the receipts showed that the payments were made by Mrs. Fisler, but that such was the actual fact. The testimony now offered on the part of Mrs. Lauman tends to show that it was the money of George Preacher and not that of Mrs. Fisler. So, if it be true that Mrs. Fisler did pay it—did deliver it to the mortgagee—but that it was the money of George Preacher, there could be no valid objection to proving that fact, notwithstanding what is said in the agreement, which only states that she paid it, as it would be competent to go beyond that and prove whose money it was. But inasmuch as no rights of other parties had intervened and the fund was still under the control of the Court, it would be a reflection on the administration of justice to hold that a Court of Equity was helpless to cor-

rect the mistake made under such circumstances, even if the agreement be construed to admit that it was the money of Mrs. Fisler, if in point of fact it was not. It is not an attempt to contradict or vary an agreement in writing by parol testimony, but to show that the solicitor for the appellee made a mistake at the former hearing when he admitted that the payment was made by Mrs. Fisler—being led to make the mistake by reason of the fact that he accepted the statement of the solicitor for the opposite side as correct. Having ascertained that they were both mistaken, we cannot imagine any possible reason why he could not in due time notify the other solicitor that he would not consent to abide by the agreement of facts entered into for the previous hearing, but would require testimony to be taken to establish the fact. If the Court saw that an error had been thus made it was clearly its right to see that it was corrected.

We will therefore consider the testimony to ascertain what it establishes in reference to the payments made on the mortgage. There is a receipt written in a book which was offered in evidence which reads, "Received April 28, 1887, of Mrs. Anna C. Fisler, six hundred dollars on account of mortgage note;" and another of August 29, 1888, in the same form for three hundred dollars. Neither of those was signed by any one, but Messrs. Keiger and Collier, who had been in the employ of Mr. Talbott, who died some years before the mortgage was foreclosed, testified that they were in his handwriting, and on the note there was an endorsement signed by him as follows: "Received April 28, 1887, forty dollars on account of interest on the within note; also on same date six hundred on account of note. E. A. Talbott." But the secretary of the Land and Loan Association of Ellicott City testified that on April 14, 1887, he issued an order to Louis Preacher for $607.11, being the amount which stood to his credit in the Association. B. H. Wallenhorst, the treasurer, testified that he received the order and on April 18, 1887, gave a check on

the Patapsco National Bank of Ellicott City, payable to
Louis Preacher or order, for that amount, and he produced
the check which was endorsed by Louis Preacher and E.
A. Talbott. The teller of the bank testified that he found
in the check-book, under date of April 30, 1887, a memo-
randum of a check paid by the Bank, issued by B. H.
Wallenhorst, treasurer, to Preacher, for $607.11; that. the
deposit-ticket dated April 29, 1887, showed that E. A.
Talbott had credit for a check of that amount. He explains
the discrepancy in the dates by saying the deposit was prob-
ably made late in the day, or after banking hours, and the
check charged the next day. Mrs. Holtman testified that
Mrs. Fisler told her that it was Louis Preacher's money in
the Building Association, and that she had paid that on the
mortgage. Mrs. Miller, a witness produced on behalf of
the administrator of Mrs. Fisler, said, on cross-examination,
that Mrs. Fisler had received money of Louis Preacher
from the Building Association, and in answer to question,
"What amount?" she replied, "She received a check of six
hundred one year prior to his death" and that after his death
she received a check for one hundred dollars. There is no
evidence to in any way contradict any of the above testi-
mony. Mr. Rogers testified as to statements made by Mrs.
Fisler to him that she had paid for the improvements on
the property, etc., but, although we do not find in the record
any exceptions to that testimony, the statement made by
Mrs. Fisler, in her own interest, when offered on behalf of
her administrator, cannot prevail over the positive testimony
of the witnesses we have referred to, even if it be accepted
and given its full effect. We cannot consider the testimony
of Mrs. Lauman as to statements made to her by her hus-
band, it being excepted to and clearly not admissible, but
the testimony of the other witnesses was admissible and
convinces us that the check for $607.11 was used in mak-
ing the payments of April 28, 1887. There is nothing to
show that it was not Louis Preacher's money, which was in
the Building Association in his name and whether earned

by him or his mother is wholly immaterial.  If she gave it
to him, her administrator cannot recover it back because it
was a gift, and the evidence is clear that she knew the ac-
count in the association was kept in his name and there is
nothing to overcome the presumption that it was his.  Louis
Preacher's estate should therefore be credited with payment
on the mortgage for that amount.  The other payments,
with the exception of that paid out of the proceeds of sale,
were made by Mrs. Fisler, and her estate must be credited
with them.

After the above testimony was taken, the special auditor
returned two accounts made by him—both being in accord-
ance with the opinion of the court that the parties were
equally liable for the mortgage debt, but " Account A "
was on the theory that Louis Preacher had paid the $607.11
and " Account B " that Mrs. Fisler had paid the whole
mortgage debt, excepting the balance of $306.44, paid out
of the proceeds of sale.  " Account A " distributed the
whole surplus to Christina Lauman, administratrix of Louis
Preacher, and ascertained that he and his estate had over-
paid $152.95, with which Mrs. Fisler was to be charged,
while " Account B " allowed Mrs. Fisler's estate for the
excess she had paid, assuming that she had paid the $607.11.
" Account A " was ratified by the Court, but the auditor
was directed to distribute the surplus to the parties entitled
to the distribution of the estate of Louis Preacher, which
was done by another audit, by which part was distributed
to the appellee as the widow of Louis Preacher, and the
balance to the appellants as next of kin of Mrs. Fisler, they
being her brothers and sister, and as assignees of her only
other sister.  The appellants, however, not only objected to
being charged with the $607.11, but they claim that as Mrs.
Fisler was a life-tenant and Louis Preacher the remainder-
man, her estate should not be charged with any part of the
principal used in making permanent improvements on the
property.

It thus becomes necessary to determine whether Mrs.

Fisler's share in the estate was properly charged with one-half of the mortgage and the amount overpaid by Louis Preacher, it being admitted by the statement of facts (which in this respect is not shown to have been a mistake, and we do not understand to be questioned) that the money was used in making permanent improvements on the property. Courts of Equity are sometimes called upon to solve difficult problems in seeking to do substantial justice between life-tenants and remainder-men, in relation to betterments and permanent improvements placed on the property. There are, it is true, certain established rules that govern them in ordinary cases. For example, when an encumbered estate is left to one for life, with remainder to another, the life-tenant is usually required to pay the interest on the encumbrance, but not the principal, (*Barnum* v. *Barnum*, 42 Md. 321; *Mayor, etc., of Baltimore,* v. *Boyd*, 64 Md. 12), and when he is required to pay the principal, or any part of it, for the protection of his estate, he is generally entitled to be compensated by the remainder-man. If a tenant for life under a will finish improvements permanently beneficial to an estate which were begun by the testator, he is in a Court of Equity entitled to a lien for the amount properly expended by him. *Gavin, Trustee,* v. *Carling,* 55 Md. 538. Then in *Gambrill* v. *Gambrill,* 3 Md. Ch. 259, a still more liberal rule was adopted in this State and followed in 55 Md. 538, *supra.* There a property was conveyed in trust for the use of Richard Gambrill for life and after his death for the use of his wife, during her widowhood, if she survived him, and then to their children. The house on the land was small, dilapidated and in an unhealthy location. Gambrill erected a new house and the property was sold under a bill filed by an infant remainder-man. Gambrill was allowed out of the proceeds of sale for the improvements, but they were clearly shown to have been made for the immediate benefit of all parties, as all, life-tenant and remainder-men, lived in the house so erected, and the improvements were necessary for the comfort of the remainder-men

as well as the life-tenant. Although a Court of Equity granted the relief without there being any agreement between the parties, the circumstances were such that it could, and doubtless would, have authorized the improvements for the benefit of the infants, if application had been previously made, as might have been done under the statute. But ordinarily a life-tenant has no power to make permanent improvements on the property at the expense of the estate in remainder, for if he could he might by his improvements sacrifice all the interest of the remainder-man, and make a character of improvements that would not meet with his approval. The general rule, therefore, is that he cannot charge the estate of the remainder-man with the costs of permanent improvements he puts on it. *Thurston* v. *Dickinson,* 2 Rich. Eq. 317, (s. c. 46 Am. Dec. 56); *Sparks* v. *Ball,* 91 Ky. 502, (s. c. 34 Am. St. Rep. 236) ; 13 *Ency. of Law* 216 ; 1 *Leading Cases on Real Property* (Sharswood and Budd), 207. As was said in *Sparks* v. *Bell,* " if she could charge the remainder-man with them, then she, at her pleasure, could improve him out of his estate."

There may of course be circumstances under which the remainder-man is properly chargeable with the principal used in such improvements. If, for example, he permitted improvements to be made with the understanding, either express or such as a Court can properly imply, that he would pay for them, or if they be made for the immediate benefit of the remainder-man, who is not legally capable of entering into an agreement, as in *Gambrill* v. *Gambrill,* *supra.* But in the case before us there is nothing to show that those made on the property were for the immediate use or benefit of the remainder-man. So far as we can gather from the record, they were not necessary for his comfort or support, and although both were *sui juris,* there is no evidence of any agreement between the life-tenant and remainder-man as to how the amount so expended was to be paid, other than what we find in the mortgage and note. The mortgage is not set out in full in the record, but the

Court below in its opinion quoted from it where it recites, " whereas the said mortgagors are indebted, etc.," and " that if the said Anna C. Fisler and Louis Preacher, their heirs, executors, administrators or assigns, shall pay to the order of the said Edward A. Talbott  *  *  *  and shall perform all the covenants herein on their part to be performed, then this mortgage shall be void." The note, which is signed by both of them, reads " Two years after date we or either of us promise to pay to the order of Edward A. Talbott." There is nothing in either to suggest that the one signed as security for the other, or that they were not equally bound between themselves, as they were, of course, to the owner of the note. It was undoubtedly their privilege to agree, if they saw fit, to borrow money to improve the property with the understanding that each should pay one-half of the debt so incurred. As the life-tenant would get the benefit of the income from the property, she might well have thought it would be to her advantage to make the improvements, especially if the remainder-man was willing to pay one-half of the cost. If she held an unimproved lot, subject to a ground rent, it was a charge on her, probably without any return, and if she could get the remainder-man to agree to pay one-half for the improvements, it may be that she could well afford to enter into such an agreement, and the remainder-man, supposing it would eventually benefit his estate, might also have reached the same conclusion as to his interest. It is not probable that they contemplated that the mortgage would not mature until after the expiration of the life-estate, for it was payable two years after date. In point of fact, the life-tenant lived about ten years after it was executed. Although the record does not give the exact dates of the death of either of them, the agreement shows that Mrs. Fisler survived her son, and whether they contemplated that or not, they at least knew it was possible. At the time the mortgage was executed he was unmarried, and if he had remained so his mother would have been his

sole distributee at the time of his death.  On the other hand, if he had survived her, he, as her only child, would have gotten the benefit of any improvements that she put on the property, and she, having survived him, did get the one-half interest in his estate, and had he not married, would have taken the whole estate, subject of course to any debts he owed.  So when their relations and all these facts are considered, it is by no means remarkable or improbable that they would be thus willing to unite in the expense of improving the property.

There is, therefore, every probability that the parties intended to do just what the mortgage and note show they did do—bind themselves jointly and severally to pay this debt.  The mere fact that one was a life-tenant and the other a remainder-man cannot overcome the legal presumption, arising from the execution of such instruments, that they were equally bound, and none of the authorities cited by the appellants, or that we have found, in any wise stand in the way of our reaching that conclusion.  Inasmuch then as they were jointly and severally bound, each could be required by the other to pay one-half of the debt, and the one paying more than half could demand of the other the excess so paid.  *Owens* v. *Collinson*, 3 G. & J. 25; *Wheeler's Estate*, 1 Md. Chy. 80.  Ordinarily the life-tenant would be required to pay the interest on the encumbrance because he receives the rents and profits from the estate, but inasmuch as the relation of these parties to this mortgage was simply that of joint and several obligors, the Court below was right in charging Louis Preacher's estate with one-half of the interest.  The auditor distributed to the appellee, as widow of Louis Preacher, one-half of the surplus, after paying the mortgage and costs, to which he added one-half of the overpayment, and the remainder he distributed to the appellants.  The latter have no good cause for complaining of such distribution, which was ratified by the decree of the Court below.  They thus have it distributed directly to them, instead of receiving it

in the regular way, through the appellee as administratrix
of Louis Preacher, (it being leasehold property), who would
have been entitled to commissions on the sum so received
by her.    No appeal was taken, however, by her or the ad-
ministrator of Anne C. Fisler, although they were parties
to the proceedings, and no objection has been made to this
method of disposing of the fund.    We do not feel called
upon therefore to pass on the propriety of making the dis-
tribution in a Court of Equity, instead of in the Orphans'
Court, especially as there is an agreement of the solicitors,
representing the various parties, consenting to the distribu-
tion to the appellee and the appellants, according to their
respective interests.    We assume that there are no creditors
or others who might be thereby injuriously affected, and if
there were any, that they have been protected in some of
the proceedings which are referred to but not set out in the
record.    The decree of the lower Court will be affirmed.

> *Decree affirmed, costs in this Court
> and those in the Court below,
> not already allowed in the audits,
> to be paid by the appellants.*

(Decided March 22nd, 1900.)